547 So.2d 148 (1989)
AUTO-OWNERS INSURANCE COMPANY, Appellant,
v.
ST. PAUL FIRE and MARINE INSURANCE COMPANY and Ray E. Ulmer, Jr., Appellees.
No. 88-00540.
District Court of Appeal of Florida, Second District.
May 3, 1989.
On Motion for Rehearing August 2, 1989.
*149 Warren M. Goodrich, Steven L. Brannock, and David N. Finkelstein of Holland & Knight, Tampa, for appellant.
E. Clay Parker and Pamela A. Mark of Parker, Johnson, Owen, McGuire & Michaud, P.A., Orlando, for appellee St. Paul Fire and Marine Ins. Co.
Jeffrey R. Fuller of Williams, Brasfield, Wertz, Fuller & Lamb, P.A., St. Petersburg, for appellee Ray E. Ulmer.
SCHEB, Acting Chief Judge.
This appeal focuses on one more phase of seemingly endless litigation. This phase concerns issues of indemnity and contribution. The case originated in an action for damages by Kenneth McGuire, who suffered serious permanent injuries in 1967 when he dove from a pier owned by La Playa of Reddington Beach, Inc. and located on land owned by First Arlington Investment Corporation. McGuire recovered a judgment for $1,000,000 against First Arlington and La Playa, and this court affirmed. First Arlington Inv. Corp. v. McGuire, 311 So.2d 146 (Fla. 2d DCA 1975), cert. denied, 330 So.2d 16 (Fla. 1976).
In 1975, First Arlington and La Playa filed suit against their insurance carrier, Auto-Owners Insurance Company, and Ray E. Ulmer, Jr., the attorney Auto-Owners selected, alleging that Auto-Owners and Ulmer were negligent in defending First Arlington and La Playa. Ulmer's malpractice carriers, American Home Assurance (AHA), Continental Casualty Company (CNA) and St. Paul Fire and Marine Insurance Company (St. Paul) were joined as defendants because each provided malpractice coverage for specific periods during Ulmer's representation.[1] Auto-Owners filed a cross-claim against Ulmer, his law firm, and his three malpractice carriers, seeking indemnification and contribution in the event it was liable to First Arlington and La Playa.
On or about October 19, 1979, the parties in the litigation, except Ulmer, his law *150 firm, and St. Paul, entered into a series of settlement agreements resulting in the payment of damages to Arlington and La Playa. Auto-Owners agreed to pay $750,000; CNA agreed to pay its policy limits subject to a resolution of whether its policy limits were $250,000 or $500,000;[2] and AHA agreed to pay $500,000. All claims except those of First Arlington and La Playa against Ulmer and St. Paul and Auto-Owners' cross-claim against Ulmer and St. Paul were settled. Arlington and La Playa covenanted not to sue Auto-Owners, Ulmer's law firm, AHA and CNA. Auto-Owners covenanted not to sue Ulmer's law firm, AHA, or CNA. While Auto-Owners neither released nor covenanted not to sue Ulmer, all parties to the agreements, including Auto-Owners, did agree that any judgment obtained against Ulmer would never be recorded and that collection would be enforced solely against Ulmer's malpractice carrier, St. Paul. As mentioned, St. Paul was not a party to these agreements.
Litigation by First Arlington, La Playa, and Auto-Owners continued against Ulmer and St. Paul. On April 27, 1983, the trial court entered a final summary judgment in favor of Ulmer and St. Paul and against First Arlington and La Playa, holding that the settlement agreements referred to had the legal effect of discharging Ulmer and St. Paul. On appeal, this judgment was affirmed per curiam without opinion. First Arlington Inv. Corp. v. Ulmer, 446 So.2d 108 (Fla. 2d DCA 1984).
On November 15, 1984, the court entered final summary judgment against Auto-Owners because it did not obtain a release from Ulmer as required by section 768.31(2)(d), Florida Statutes (1987), and therefore could not maintain a suit for contribution against St. Paul.
In April 1987, Ulmer, St. Paul, and Auto-Owners filed motions for summary judgment. St. Paul argued that because Auto-Owners agreed not to enforce any judgment against Ulmer's assets, it had no obligation to pay under Ulmer's liability policy. However, the trial judge found there was a disputed issue concerning the parties' intent with respect to the 1979 agreements, so he empaneled a jury to resolve that issue. The jury found that Auto-Owners did not intend that any judgment it might obtain against Ulmer would be Ulmer's obligation. Rather, Auto-Owners simply agreed to seek collection only from St. Paul. The legal effect of the 1979 agreements remained subject to interpretation by the court.
The court denied Auto-Owners' motion for summary judgment and entered a final summary judgment in favor of Ulmer and St. Paul on January 23, 1988. The court held that Auto-Owners' agreement not to collect against Ulmer barred its claim for indemnity against St. Paul. Auto-Owners now challenges this ruling and the November 15, 1984, ruling.
This appeal presents two issues. The first is whether the trial court properly granted final summary judgment on Auto Owners' indemnity claim against Ulmer and St. Paul. The second concerns the trial court's earlier grant of final summary judgment to Ulmer and St. Paul on Auto-Owners' claim for contribution.

The Indemnity Issue
The parties have not cited, nor has our research revealed, any Florida cases which control this issue. Disputes involving similar factual scenarios have arisen in other jurisdictions, however, and it appears that two divergent views have developed. As this is a case of first impression in Florida, we have chosen what we consider to be the better view.
At the outset, we note that the cornerstone of our decision is the deeply rooted principle of Florida law that the intent of the parties controls interpretations of their releases. See, e.g., Atlantic Coast Line R.R. v. Boone, 85 So.2d 834 (Fla. 1956). The language of the 1979 settlement agreements clearly indicates and the jury found that it was not Auto-Owners' intention to *151 release St. Paul from liability. Auto-Owners argues that to allow St. Paul to escape liability because of documents to which it was not a party and which were executed with no intention of releasing St. Paul would be unfair. We find support for this argument in Bodzo v. Willits Int'l Corp., 428 So.2d 225 (Fla. 1983), in which the Florida Supreme Court avoided a result which it branded "manifest injustice" by refusing to release a joint obligor simply because a co-obligor had been released where no such dual release was intended. Bodzo at 227.
The line of cases we choose to follow is best exemplified by Deblon v. Beaton, 103 N.J. Super. 345, 247 A.2d 172 (1968). In Deblon, a widowed plaintiff sued the defendant and his two insurance carriers, one of which was Jersey Insurance, for the wrongful death of her husband. The plaintiff agreed that although she would proceed to judgment against the insured defendant, she would seek to collect only from Jersey. Jersey argued, as does St. Paul here, that the agreement released it from liability because the policy of its insured obligated Jersey to pay only that which its insured was "legally obligated to pay." Noting that the policy was one of insurance against liability rather than one of indemnity against loss, the New Jersey court concluded that the narrow construction advanced by Jersey ignored the fact that it was not the plaintiff's intention to release Jersey. The court, therefore, reversed the trial court's grant of Jersey's motion to dismiss.
Despite St. Paul's arguments to the contrary, we find the facts of Deblon to be similar to those in the instant case. In Deblon, the plaintiff expressly reserved rights against Jersey. St. Paul argues that Auto-Owners did not make such a reservation. We find, however, that it did. In the 1979 agreements, it is clearly stated that with the exception of the covenant not to execute against Ulmer, there was to be no modification of Auto-Owners' rights in its action against Ulmer and St. Paul. Nowhere in the various documents did Auto-Owners covenant not to sue Ulmer.
The New Jersey court undergirded its decision in Deblon by discussing several public policies which influenced it, all of which are equally viable in Florida. After discussing the importance of enforcing the parties' intentions, the court in Deblon noted the necessity of giving broad interpretation to coverage so as to protect injured persons. St. Paul argues that this policy consideration is inapplicable since the "injured" parties, La Playa and First Arlington, were made whole by settlements. We recognize, however, Auto-Owners' right to seek indemnification from St. Paul since it has been financially lessened by its contribution to those settlements.
The Deblon court also discussed the policy of encouraging settlements, even if they are merely partial ones, as executed in this case. To release a party which did not engage in settlement negotiations because of those settlement agreements would, we think, have negative implications. Such a ruling could potentially discourage future litigants from entering into compromise negotiations for fear that they might thereby limit their remedies against other parties, regardless of their intent not to do so.
The court in Deblon further commented that an injured plaintiff acquires an interest in an insurance policy at the time of the accident, thereby rendering the insurance company directly liable regardless of collection efforts against the insured. We find this part of the court's discussion especially persuasive in light of the fact that this action commenced at a time when a direct action against an insured's carrier was permissible. Shingleton v. Bussey, 223 So.2d 713 (Fla. 1969).
Other jurisdictions have either explicitly followed what we think is Deblon's wellreasoned analysis, see, e.g., Loy v. Bunderson, 107 Wis.2d 400, 320 N.W.2d 175 (1982), or have come to a similar conclusion on their own.[3] In Coblentz v. American Surety Co. of New York, 416 F.2d 1059 *152 (5th Cir.1969), the federal court, applying what it deemed to be current Florida law, reinstated a verdict against an insurance company which advanced claims similar to those of St. Paul. We recognize that Coblentz concerned an insurance carrier that deserted its insured and refused to defend him and that the holding was primarily based on a theory that once the carrier elected to leave its insured to his own defenses, it could not later complain about any self-preserving, non-enforcement deals he had made. Although we note this factual distinction, we think Coblentz represents one more indication that many courts, including Florida's, look with disfavor on the idea that a covenant not to enforce against one party automatically releases that party's insurance carrier.
We are not unmindful of the merits of the contrary line of decisions led by the flagship case of Stubblefield v. St. Paul Fire & Marine Ins. Co., 267 Or. 397, 517 P.2d 262 (1973).[4] There is obvious appeal in the simple reasoning that if an insured will never be forced to pay any money, that party's insurance carrier, which is obligated to pay only those sums which its insured is "legally obligated to pay," is freed from all liability. However, the mere fact that a legally-obtained judgment may not be enforced against a party does not mean that the party is not "legally obligated to pay." Since Auto-Owners did not covenant not to sue Ulmer, it is free to continue its action against him and proceed to final judgment. Had Auto-Owners made such a covenant not to sue Ulmer, we think St. Paul would be correct because then a validly-obtained judgment could never be entered against Ulmer. St. Paul emphasizes that if such a judgment were obtained, Auto-Owners has promised not to record it. The recording of a judgment, however, only protects the holder from the claims of third parties. It does not affect the status of the judgment between the litigants. Like the court in Deblon, we are dealing with a policy of insurance against liability. Were we faced, instead, with a policy of indemnity against loss, St. Paul's argument may be more persuasive; however, we do not address that point.
In sum, we find that there was no intention by Auto-Owners to give up its rights of indemnification against St. Paul. To allow St. Paul to be exonerated based on a document it never signed and agreed to by parties with no intention to releasing it would run counter to the prevailing public policies of this state.

The Contribution Issue
We now address Auto-Owners' claim for contribution from St. Paul for its share of the sums which Auto-Owners paid toward the overall settlement. Auto-Owners disputes the trial court's reasoning that it is barred from seeking contribution because in settling with AHA and CNA, Auto-Owners did not obtain a complete exoneration or release of Ulmer.
While unknown to the common law, the doctrine of contribution is a statutory recognition of the need for an equitable apportionment of the common liability of multiple tortfeasor to an injured party. Section 768.31, Florida Statutes (1987), provides for such an apportionment by requiring each tortfeasor to pay his or her share of a settlement or judgment. Subsection (2)(d) provides, however, a prerequisite to collection:
A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement or in respect to any amount paid in a settlement which is in excess of what was reasonable.
In order to seek contribution from St. Paul, Auto-Owners must establish that the sums it paid extinguished First Arlington and La Playa's claims against Ulmer and St. Paul. This it cannot do. Auto-Owners concedes that it was not through its efforts that Ulmer and St. Paul were released. To *153 the contrary, the settlement agreements of October 1979 clearly contemplated that First Arlington and La Playa would pursue their claims against Ulmer and St. Paul for acts of negligence allegedly occurring within St. Paul's coverage of Ulmer.
Auto-Owners points out, however, that although Ulmer and St. Paul were not released by the 1979 agreements, they were released as a matter of law by the trial court's entry of final summary judgment entered April 26, 1983, against First Arlington and in favor of Ulmer and St. Paul. This judgment was subsequently affirmed by this court. First Arlington Inv. Co. v. Ulmer, 446 So.2d 108 (Fla. 2d DCA 1984). It is true that Ulmer and St. Paul were eventually released, but we interpret the statute to require that such a release must be effectuated by the party seeking contribution. Reviewing, therefore, only the 1979 agreements, we find that the claims of Auto-Owners, First Arlington, and LaPlaya against Ulmer and St. Paul were unaffected by the settlements and did not contemplate Auto-Owners seeking contribution. Accordingly, we hold that Auto-Owners did not obtain the necessary release of Ulmer and therefore, cannot maintain an action for contribution against St. Paul.

Conclusion
We therefore affirm the final summary judgment of November 15, 1984, denying contribution from St. Paul to Auto-Owners. We reverse the final summary judgment of January 23, 1988, foreclosing Auto-Owners from seeking indemnity from St. Paul.
Affirmed in part; reversed in part, and remanded for further proceedings.
THREADGILL and PARKER, JJ., concur.

ON MOTIONS FOR REHEARING OR, ALTERNATIVELY, FOR CERTIFICATION
PER CURIAM.
St. Paul and Ulmer filed motions for rehearing or, alternatively, for certification of issues in our opinion rendered May 3, 1989. Auto-Owners has responded to each. While much of the motions repeat arguments the parties raised in their initial briefs and during oral argument, we think it appropriate to expound upon some points not fully addressed in our opinion. For clarification, therefore, we elaborate on four issues St. Paul and Ulmer emphasize in their motions.
First, St. Paul argues that Auto-Owners cannot maintain an action for indemnity against Ulmer and St. Paul because the party seeking indemnification must be totally blameless and its liability must be merely constructive or derivative in nature. Houdaille Industries, Inc. v. Edwards, 374 So.2d 490 (Fla. 1979). St. Paul contends that Auto-Owners is not totally blameless because there are allegations that Auto-Owners was actively negligent in its supervision of Ulmer. We think St. Paul's attempt to defeat Auto-Owners' indemnity claim is premature. Auto-Owners is entitled to an opportunity of establishing at trial its right to indemnification, one element of which is the absence of active negligence on Auto-Owners' part.
Second, St. Paul and Ulmer argue that our decision allows Auto-Owners to pursue its indemnity claim after it improperly "split its cause of action" by settling with and covenanting not to sue two of Ulmer's liability insurance carriers. We do not find that Auto-Owners split its cause of action. Rather, a review of the pleadings reveals that Auto-Owners asserted a single cause of action, indemnity, against all three of Ulmer's malpractice carriers. It sued each company for all of Ulmer's allegedly negligent acts, as opposed to dividing up its indemnity claim by suing each carrier for only those acts of negligence occurring within their respective policy periods. When Auto-Owners released CNA and AHA, the single cause of action continued to exist but only against St. Paul. We agree with Auto-Owners that to hold otherwise would greatly lessen the appeal of settlement negotiations to plaintiffs.
*154 Third, St. Paul criticizes our failure to decide whether an insurance company can be held vicariously liable for the negligent acts of an attorney it hires to defend its insured. It contends that our answer to this question is essential because if an insurance company cannot be held vicariously liable, First Arlington and La Playa could never have obtained a judgment against Auto-Owners. It would then follow that the settlement monies which Auto-Owners paid and which it now seeks to recover would be mere voluntary payments which St. Paul has no obligation to reimburse.
We do not feel that the resolution of this appeal requires us to take a position on this question. The liability of an insurance company in such situations may depend on a factual determination of whether, within the scope of a particular task, the attorney was an independent contractor or an employee. Counsel has advised us, and our independent research has confirmed, that there are no cases in which an appellate court in Florida has held that an insurance company is vicariously liable as a matter of law in a factual situation similar to the one at bar. We note that other states espouse various views, with what Auto-Owners calls "an apparent majority" holding that such liability does exist.
As Auto-Owners indicates in its response to the motions for rehearing, Florida's final stand on the issue of vicarious liability is irrelevant to the indemnity action at hand. Since Auto-Owners is entitled to recover for any reasonable settlement it made, Post Houses, Inc. v. Fireman's Fund Ins. Co., 469 So.2d 863 (Fla. 1st DCA), review denied, 478 So.2d 54 (1985), a factual issue central to Auto-Owners' right to indemnity is whether its settlement was reasonable. The settlement's reasonableness will be determined in part by the possibility of exposure in light of the silence of Florida's courts on this issue at the time the settlement agreements were signed. Therefore, we decline at this time to opine further as to the existence of an insurance company's vicarious liability for acts of attorneys it hires to represent its insured.
Finally, St. Paul requests that we outline those genuine issues of material fact which remain and thereby preclude summary judgment. We can see several such issues, some of which we have noted above. The most obvious of these issues, central to the parties' respective liabilities, is whether Ulmer was in fact negligent and committed malpractice in his handling of the initial litigation. Without resolution of this basic factual issue, a summary judgment either granting or denying indemnity would be improper.
Having clarified our opinion, we deny the motions for rehearing and, alternatively, for certification filed by St. Paul and Ulmer.
SCHEB, A.C.J., and THREADGILL and PARKER, JJ., concur.
NOTES
[1] When this action was filed in 1975, a direct action against an insured's carrier was permissible. Shingleton v. Bussey, 223 So.2d 713 (Fla. 1969), superseded by § 627.7262, Fla. Stat. (1983).
[2] In Continental Casualty Co. v. First Arlington Inv. Corp., 497 So.2d 726 (Fla. 2d DCA 1986), this court found that CNA's policy limit was not $250,000.
[3] See, Farmers Mutual v. Drane, 383 S.W.2d 714 (Mo. 1964); Futch v. Fidelity & Casualty Co., 136 So.2d 724 (La. 2d Ct.App. 1961); Benroth v. Continental Casualty Co., 132 F. Supp. 270 (W.D.La. 1955).
[4] See, Bendall v. White, 511 F. Supp. 793 (N.D. Ala. 1981) (adopting Stubblefield) and Huffman v. Peerless Ins. Co., 17 N.C. App. 292, 193 S.E.2d 773 (App.), cert. denied, 283 N.C. 257, 195 S.E.2d 689 (1973) (specifically rejecting Coblentz as non-controlling).