802 So.2d 291 (2001)
Bonnie ROSEN, Petitioner,
v.
FLORIDA INSURANCE GUARANTY ASSOCIATION, Respondent.
No. SC95889.
Supreme Court of Florida.
September 20, 2001.
Rehearing Denied December 11, 2001.
*292 Lauri Waldman Ross of Lauri Waldman Ross, P.A., Miami, FL, for Petitioner.
Helen Ann Hauser of Dittmar & Hauser, Coconut Grove, FL, for Respondent.
PARIENTE, J.
We have for review Rosen v. Florida Insurance Guaranty Ass'n, 734 So.2d 491 (Fla. 1st DCA 1999), a decision from the First District Court of Appeal that misapplies this Court's decision in Fidelity & Casualty Co. v. Cope, 462 So.2d 459 (Fla. 1985). Based on the conflict created by this misapplication, we have jurisdiction under article V, section 3(b)(3), Florida Constitution. See Vest v. Travelers Ins. Co., 753 So.2d 1270, 1272 (Fla.2000); Arab Termite & Pest Control, Inc. v. Jenkins, 409 So.2d 1039, 1040 (Fla.1982).

BACKGROUND
Bonnie Rosen sued a Dade County law firm (known by the pseudonym of "the AB Law Firm"),[1] its principal, and one employee *293 for breach of contract, fraud, breach of fiduciary duty, negligent supervision, conversion, and intentional infliction of emotional distress that arose out of representation of Rosen on several matters. See Rosen, 734 So.2d at 491. Rosen alleged that the firm grossly overcharged her by double-billing and churning, that it would not surrender files to new counsel and that one member of the firm threatened to reveal confidences to a party opponent. See id. Although the bills for AB Law Firm's services totaled nearly $340,000, Rosen paid AB Law Firm $269,000.
AB Law Firm had a $1,000,000 liability insurance policy with Manatee Insurance Company ("Manatee"),[2] and the insurer initially provided the firm with legal representation. See id. The insurance policy contained a "declining balance" feature, meaning that defense costs reduced the amount of money available to pay damages. See id. at 491-92.
During the litigation, Manatee was declared insolvent and pursuant to chapter 631, Florida Statutes, Respondent Florida Insurance Guaranty Association ("FIGA") assumed the defense as receiver. See id. at 492. Before declaring insolvency, Manatee had spent just under $200,000 on defense costs. Thus, under the original $1,000,000 declining balance policy, $800,000 remained available for indemnification. FIGA took the position that its $300,000 per claim liability limit pursuant to section 631.57(1)(a)2, Florida Statutes (1997), applied to the Rumger-Manatee policy's declining balance provision, meaning that only $300,000 was available for both indemnification and all costs, including attorneys' fees. See id.
As the matter neared trial, all but $39,000 of FIGA's statutory $300,000 limit had been consumed in defense costs. See id. Soon after FIGA notified the parties of this fact, Rosen and AB Law Firm entered into a settlement agreement on the following terms: "AB Law Firm would consent to a judgment of $261,000 against it,[3] but the judgment would never be recorded, would create no liens and could not be executed." Id. The agreement provided, in pertinent part: "The foregoing is not intended, nor should it be construed, to prejudice the potential claim, whether valid or invalid, that Bonnie Rosen may decide to pursue against FIGA." Moreover, with respect to dismissal of the underlying suit, the agreement provided that it "does not impair the judgment referenced in paragraph no. 2 ... and thus shall not impair Bonnie Rosen's right to pursue a lawsuit, inclusive of a claim for attorneys' fees if proper, against FIGA."
In return for not recording the judgment or creating any liens, Rosen would accept $39,000 from FIGA, would attempt to collect the balance of the $300,000 from FIGA, and upon conclusion of that litigation would release AB Law Firm or file a notice of satisfaction of judgment. See id.
After the agreement was signed, FIGA paid the sum of $39,000, without obtaining a release from Rosen. Although the First District concluded that "[i]t appears that other than to agree to pay the remaining $39,000, FIGA in no way participated in the negotiations," Id. at 492, FIGA did review the settlement documents exchanged between the parties at least three times before the parties finalized and signed the agreement.
*294 Rosen then filed a declaratory judgment action seeking a determination that FIGA was not entitled to deduct the $261,000 paid out in defense costs from the per-claim limit and an order requiring FIGA to pay her $261,000 in satisfaction of the judgment against AB Law Firm. See id. Rosen based her claim on the legal position that the declining balance should be computed from the $1,000,000 limits of the Rumger-Manatee policy, rather than from the $300,000 statutory limit for claims. See id.
Both sides moved for summary judgment and the trial court granted FIGA's motion. See id. The trial court characterized the agreement between Rosen and AB Law Firm as a release, and reasoned that because Rosen had agreed to release AB Law Firm at the conclusion of the litigation with FIGA, the release had extinguished any liability that FIGA had as an insurer. See id. Thus, the trial court ruled that by agreeing to release AB Law firm, Rosen thereby released FIGA.[4]
The First District affirmed the granting of summary judgment, holding that the trial court correctly decided the case "in light of two cases that present similar factual scenarios," citing to Kelly v. Williams, 411 So.2d 902 (Fla. 5th DCA 1982), and Cope, 462 So.2d at 459. See Rosen, 734 So.2d at 492. The First District explained that Kelly and Cope both stood for the proposition that the release of a tortfeasor relieves the insurer of its legal obligation to pay damages, absent an assignment of claims. See Rosen, 734 So.2d at 492. Therefore, the First District held that Rosen could not bring an action against FIGA because she had released AB Law Firm from all liability without obtaining an assignment of rights.[5]

DISCUSSION
The issue presented is whether our decision in Cope controls the outcome of this case. Cope involved a bad-faith action brought by an injured party against an insurance company after the injured party had released the insured tortfeasor from all liabilityincluding liability in excess of the policy limits. 462 So.2d at 459. In that case, we acknowledged that the essence of a bad-faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim. See id. at 460.
Our holding in Cope was a narrow one "if an excess judgment has been satisfied, absent an assignment of that cause of action prior to satisfaction, a third party cannot maintain action for a breach of duty between an insurer and its insured." Id. at 461. Significantly, however, in that case the underlying claim no longer existed after the release and satisfaction of judgment.
The other case upon which the First District relied, Kelly, also focused on whether a bad-faith cause of action was preserved by the stipulation of the parties. 411 So.2d at 902. In Kelly, the Fifth *295 District observed that, although the stipulation clearly contemplated a future third-party action against the insurer for bad faith, because the stipulation in that case limited the insurer and the insured's liability to the $50,000 policy amount, no cause of action for bad faith could exist. 411 So.2d at 904.
Accordingly, the dispositive question in this case is whether the settlement agreement between Rosen and AB Law Firm constituted a release of the insured and FIGA from all further liability.[6] Appellate courts have recognized the "deeply rooted principle of Florida law that the intent of the parties controls interpretations of their releases." Auto-Owners Ins. Co. v. St. Paul Fire & Marine Ins. Co., 547 So.2d 148, 150 (Fla. 2d DCA 1989) (citing Atlantic Coast Line R.R. v. Boone, 85 So.2d 834, 842 (Fla.1956)); see also Steil v. Florida Physicians' Ins. Reciprocal, 448 So.2d 589, 591 (Fla. 2d DCA 1984). As we stated in Stephen Bodzo Realty, Inc. v. Willits International Corp., 428 So.2d 225, 227 (Fla.1983): "To allow these respondents to escape this obligation by relying on a document executed by others who had no intention of releasing them is the epitome of manifest injustice."
In Atlantic Coast Line, this Court distinguished between a release and a covenant not to sue, explaining:
A release is an outright cancellation or discharge of the entire obligation as to one or all of the alleged joint wrongdoers. A covenant not to sue recognizes that the obligation or liability continues but the injured party agrees not to assert any rights grounded thereon against a particular covenantee.
85 So.2d at 843. In Atlantic Coast Line, the plaintiff sued both the driver of an automobile in which he was a passenger and the train that hit the car as joint tortfeasors. The plaintiff subsequently signed an agreement with the automobile driver promising: "to forever refrain from instituting, pressing or in any way aiding any claim, demand, action or causes of action, for damages, cost, loss of service, expenses or compensation for, on account of, or in any way growing out of, or hereafter to grow out of an accident." Id. at 842. The Court concluded that the agreement constituted a release rather than a covenant not to sue because the covenant was comprehensive and contemplated refraining from suing both the driver and the railroad. See id.
The Court explained that in the situations in which it had found a covenant not to sue instead of a release, the individual executing the covenant expressly reserved his or her rights against parties other than those specifically named in the covenant. See id. at 843. Therefore, because the Court concluded that the plaintiff in Atlantic Coast Line made no such reservation and the language of the covenant did not indicate an intent to reserve her rights to sue the railroad, the agreement constituted a release of the railroad from suit. Id. at 842-43.
Following this Court's reasoning in Atlantic Coast Line, the Second District in Auto-Owners, held that a settlement agreement between a third-party tort claimant and an insured in which the claimant agreed that any judgment obtained against the insured would never be recorded and that collection would be enforced solely against the insurer did not *296 constitute a release. 547 So.2d at 150-51. Similar to the instant case, the insurer in Auto-Owners argued that because the claimant promised not to record any judgment it obtained from the insured, the insurer had no obligations, as the insured was no longer "legally obligated to pay." Id. at 152. The Second District rejected this argument, however, noting that "the mere fact that a legally-obtained judgment may not be enforced against a party does not mean that the party is not `legally obligated to pay.'" Id. The Second District rejected the notion that a promise not to record the judgment somehow barred an action against the insurer, reasoning: "The recording of a judgment, however, only protects the holder from the claims of third parties. It does not affect the status of the judgment between the litigants." Id.
The Second District concluded that the language of the settlement clearly indicated the claimant's intention not to release the insurer from liability. See id. at 150. The Second District found persuasive the claimant's argument that "to allow [the insurer] to escape liability because of documents to which it was not a party and which were executed with no intention of releasing [the insurer] would be unfair." Id. at 151. The Second District explained that several public policies influenced its decision, including: (1) the importance of enforcing the parties' intention; (2) the necessity of giving broad interpretation to coverage so as to protect injured persons; and (3) the encouragement of settlements, even if they are partial ones. See id.
Other district court cases reflect the emphasis placed on the intent of the parties in determining whether their agreements are releases or agreements not to execute. Although the case of Shook v. Allstate Insurance Co., 498 So.2d 498 (Fla. 4th DCA 1986), involved an assignment, the Fourth District focused on the intent of the parties in concluding that the claimant could bring a direct action against the insurer after she settled her claim with the insured. The claimant agreed to execute and deliver a satisfaction of judgment to the insured, regardless of the outcome of any bad-faith action against the insurer, and the claimant obtained an assignment from the insured. Id. at 499. The insurer argued that because the insured neither paid nor became obligated to pay any money in satisfaction of the plaintiff's claim, the insurer could not be held responsible after the insured had been discharged from liability. See id. The Fourth District rejected the insurer's argument, noting that the "circumstances surrounding the stipulation and agreement for settlement of the claim, and the language of the document demonstrate that it was not the intent of the [plaintiff] or [the insured] to release any claims that they might have against [the insurer]." Id. at 500. Therefore, the Fourth District allowed the plaintiff to bring a claim against the insurer.
Similarly, in Lageman v. Frank H. Furman, Inc., 697 So.2d 981, 982 (Fla. 4th DCA 1997), a third-party claimant sued an insurer for negligent failure to procure adequate insurance coverage arising out of a wrongful death claim. Before trial, the claimant and the insured tortfeasor entered into a settlement agreement in which the claimant agreed to accept the tortfeasor's $50,000 policy limit, the tortfeasor agreed to entry of final judgment in the amount of $3,000,000 and the claimant agreed that she would not execute against the tortfeasor for any portion of the judgment in excess of the $50,000 limit. See id. The agreement also provided "in exchange for this agreement," the tortfeasor would transfer all of its rights and causes of action against the insurer to the claimant. Id. The insurer moved for summary judgment, contending that the claimant's *297 action against the tortfeasor was extinguished by the settlement agreement, which the parties executed before the tortfeasor's assignment of the claim to the claimant. See id. at 983.
The Fourth District distinguished the situation in Lageman from our decision in Cope, stating that Cope "requires the injured party to have completely released the tortfeasor from liability from the underlying judgment or obtained a satisfaction of judgment in order to preclude a subsequent action." Lageman, 697 So.2d at 983. The Fourth District concluded that the settlement in Lageman constituted a covenant not to execute, which would not discharge the entire obligation of the parties named in the release. See id. Moreover, the Fourth District concluded that because the claimant did not execute a release or satisfaction, the tortfeasor still had an unsatisfied judgment recorded against it. See id. (citing Florida Insurance Guaranty Ass'n v. Giordano, 485 So.2d 453 (Fla. 3d DCA 1986)).[7] Thus, the Fourth District held that a covenant not to execute against an insured in exchange for assignment of the insured's cause of action against the insurer for failure to procure adequate insurance did not extinguish the cause of action against the insurer. See Lageman, 697 So.2d at 985.
In Cunningham v. Standard Guaranty Insurance Co., 630 So.2d 179, 182 (Fla. 1994), we reaffirmed the principle that parties should be encouraged to enter into agreements in which an underlying trial is avoided. In Cunningham, a third-party claimant brought suit against the insured for negligence and the insurer for bad faith in refusing to settle the claim. Id. at 180. The insurer and the claimant entered into an agreement to try the bad-faith action before trying the underlying negligence action. See id. The parties further stipulated that if no bad faith was found, then the claimant's claims would be settled for the policy limits and the insured would not be exposed to an excess judgment. See id. In approving the stipulation, we distinguished Cope on the basis that the "underlying claim no longer existed" in that case, Cunningham, 630 So.2d at 181, whereas in Cunningham, there was a stipulation that preserved the underlying claim:
This Court has looked with favor upon stipulations designed to simplify, shorten, or settle litigation and save costs to parties. Such stipulations should be enforced if entered into with good faith and not obtained by fraud, misrepresentation, or mistake and not against public policy.
Id. at 182.
Taken together, the cases discussed above illustrate the importance courts give to the intent of the parties in determining whether a release has been effectuated. As we clarified in Cunningham, the key with regard to whether Cope applies is whether the "underlying claim" continues to exist after the settlement agreement. Cunningham, 630 So.2d at 180.
In the present case, the settlement agreement clearly demonstrates the intent of the parties not to release FIGA *298 from liability and the underlying claim against the insured was not released. The failure to obtain a recordable judgment against AB Law Firm is not fatal to Rosen's claim against FIGA where the sole question remaining was the coverage dispute; that is, whether FIGA properly or improperly subtracted $261,000 of its own defense costs from the statutory limits of $300,000. We conclude that the settlement between Rosen and AB Law Firm constituted a covenant not to execute against AB Law Firm. The settlement agreement was not a release of AB Law Firm and it clearly was not a release of FIGA. Indeed, the settlement agreement contained an express reservation of the claim against FIGA and the underlying claim was not eliminated with the execution of the settlement agreement. The agreement did not provide a legal impediment to the litigation with FIGA to resolve the coverage dispute, which litigation was clearly within the contemplation of the parties.
Therefore, we conclude that the First District misapplied our decision in Cope when it concluded that the settlement agreement between Rosen and AB Law Firm constituted a release. For all the foregoing reasons, we quash the decision of the First District and remand for proceedings consistent with this opinion. On remand, any issues previously raised by the parties before the First District but left unresolved by our decision may be addressed.
It is so ordered.
SHAW, HARDING, ANSTEAD, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., dissents with an opinion.
WELLS, C.J., dissenting.
I dissent from the decision of the majority because this Court is without conflict jurisdiction within the four corners of the First District's opinion. To find conflict the majority must determine what the First District held to be a release was not a release. That cannot be determined from the four corners of the opinion. If the First District's holding is accepted, then there was not a misapplication of Fidelity & Casualty Co. v. Cope, 462 So.2d 459 (Fla.1985), within the four corners of the opinion.
NOTES
[1] As part of the settlement between Rosen and the law firm, the parties agreed to a pseudonym for the law firm to protect its identity.
[2] The policy was originally issued by Rumger Insurance Company.
[3] This number reflected the difference between FIGA's $300,000 statutory cap and the $39,000 allegedly remaining after the expenditure of $261,000 on defense costs.
[4] The trial court alternatively determined that the declining balance terms of the policy applied to the $300,000 statutory claim limit. Because of its ruling, the court did not determine the pending factual issues raised by FIGA as to whether Rosen's claims constitute "covered claims" under the policy and the FIGA statutes, and whether the settlement amount represents the fair value of the covered claims.
[5] In affirming the trial court, the First District did not pass upon a second basis for the trial court's decision; i.e. that the policy limits had been exhausted where the underlying insurance policy had a "declining balance" clause, and the total expended for defense and settlement funds had reached FIGA's statutory limit.
[6] Rosen asserts that Cope and its progeny are inapplicable because section 631.193, Florida Statutes (1997), provides an automatic release of the insured upon filing a claim with the receiver, while allowing a cause of action to be maintained against FIGA. However, the First District did not address this issue in its opinion and we therefore do not address it.
[7] Consistent with this Court's decision in Atlantic Coast Line, the Fourth District noted that it was the intent of the parties to the settlement "to assign the negligence claim prior to, or at least contemporaneously with, and as a condition of the settlement agreement and consent judgment.... To rely merely upon the timing of the execution of these documents and disregard their plain language and intent and their contemporaneous filing and recording would amount to an elevation of form over substance and intent." Lageman, 697 So.2d at 984.