[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14485
Non-Argument Calendar
_____

D.C. Docket No. 3:13-cv-00394-MCR-EMT

CHARLES R. HINSON,

Plaintiff-Appellant,

versus

TITAN INSURANCE COMPANY,
TITAN INDEMNITY COMPANY,

Defendants-Appellees,

W I OF FLORIDA INC.,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(August 8, 2016)

Before WILLIAM PRYOR, ROSENBAUM, and FAY, Circuit Judges.

PER CURIAM:

This is a diversity-of-citizenship suit, governed by Florida law, brought by Plaintiff-Appellant Charles Hinson alleging bad faith on the part of his insurer, Defendants-Appellees Titan Insurance Company and Titan Indemnity Company (collectively, "Titan")[1], in failing to settle a claim against Hinson and to advise him of the settlement offer. The district court granted summary judgment in favor of Titan. After careful review, we vacate and remand for further proceedings.

## I. BACKGROUND

This case arises out of a motor-vehicle accident on September 27, 2007. Hinson was driving in Pensacola, Florida, when he failed to yield the right of way in an intersection and struck a motorcycle operated by Martin Almand. Almand's left leg was crushed in the accident, and his motorcycle was a total loss. As a result of the accident, Almand had emergency surgery that night and was still in intensive care the following day.

At the time of the accident, Hinson was insured under a Titan automobile insurance policy, which provided bodily-injury liability limits of $10,000 per person and $20,000 per accident and identical property-damage liability limits.

---

[1] As the district court noted, the record is not clear regarding "which company issued the policy or the relationship between the Defendants." In any case, this lack of clarity has no bearing on our opinion or the district court's summary-judgment order.

2

Hinson promptly reported the accident to Titan. The next day, a Titan insurance adjuster investigated the incident, determined Hinson was at fault, and quickly realized that Hinson's liability could exceed the $10,000-per-person bodily-injury limit. Titan sent Hinson a letter on September 28 stating that Almand's claim could exceed the policy limits, that the matter could proceed to litigation, and that Hinson could be personally liable for a judgment in excess of the policy limits.

By October 1, four days after the accident, Almand's hospital bill had exceeded $69,000. That same day, Titan offered Almand the full $10,000 bodily-injury limits in exchange for an executed Release of All Claims. On October 8, Almand informed Titan that he had retained the law firm of Green & Bradford, P.A. (James Green and Bobby Bradford), to represent him in the matter. Titan promptly repeated the October 1 offer to Green & Bradford.

On October 16, Attorney Green, on behalf of Almand, sent Titan a letter stating that they were "currently investigating this matter and [were] not in a position to settle at this time," and that they would send a settlement offer once they were ready. Titan again offered the bodily-injury limits on November 7, and, on November 19, tendered a $10,000 check payable to the Almands, Green & Bradford, and the hospital at which Almand had received treatment. A Titan

3

claims note[2] reflects that Titan attempted to call Hinson on December 5 but was told that he would be home after 5 p.m.

On December 26, Titan received a demand letter from Attorney Bradford, who stated that Almand was willing to settle if eight material terms were met within twenty days of December 21, the date of the letter. In other words, Titan and Hinson had until January 10, 2008, to comply with the terms of the offer. The terms included the following: (1) tender of the bodily-injury policy limits, with the check made payable to the Almands and the law firm only, not the hospital; (2) a statement under oath from Hinson setting forth the existence of any additional insurance; and (3) payment of the replacement cost of the motorcycle plus various specified upgrades. The letter concluded, "This is an offer to enter into a unilateral contract that can only be accepted by strict performance of all of its material terms."

Though the offer letter was received by Titan on December 26, the Titan adjuster with primary responsibility for handling Almand's claim against Hinson did not review it until January 2, 2008. On that date, the adjuster attempted to call Hinson at his landline home phone. Hinson was not at home, but, according to the

---

[2] In support of its motion for summary judgment, Titan submitted evidence of its internal notes detailing its actions and other information relating to Almand's claim against Hinson. We refer to these notes as "claims notes."

adjuster, she reached Alice Kilpatrick, Hinson's then-fiancée who lived with him.[3] The adjuster advised Kilpatrick of the settlement offer and the need for Hinson to execute a sworn statement regarding additional insurance coverage. The adjuster attempted to call again on January 3 and 4 in the afternoon, but the calls would not go through. A claims note entered on January 3 states, "Attempted to call [policy holder]. Number would not go through, states I should try my call again later?" The adjuster never spoke with Hinson, and Hinson testified that he was not told by Kilpatrick that Titan had called.

On January 4, Titan sent Hinson a letter by regular mail regarding Almand's settlement offer. The letter notes that the demand letter and a proposed affidavit were enclosed. The letter advises of the policy limits and of the possibility of an excess judgment, and it suggests that Hinson may wish to consult an attorney, who "will advise you of your legal rights and the possible steps to take to avoid an excess judgment." The letter also states, "As part of the attorney's demand in this case, he is requesting an affidavit of no other insurance be completed by you and forwarded to his attention. . . . It is very important that you have this completed immediately." Hinson testified that he did not remember seeing this letter and that, during the time the settlement offer was open, he did not know of the offer or his need to provide an affidavit.

---

[3] According to the district court, Kilpatrick died shortly after this lawsuit was filed. As a result, we do not have the benefit of Kilpatrick's testimony.

Also on January 4, Titan asked Jeffrey Neu, a claims manager in Pensacola, to hand deliver the affidavit to Hinson at his home.  Hinson was not at home when Neu arrived on the afternoon of January 4, but Neu spoke with a woman who was at the home, believed by Titan to be Kilpatrick.  According to Neu, he gave the woman the affidavit and told her it needed to be signed and notarized.  Neu did not know the purpose for which the affidavit was sought or that there was a specific due date by which the affidavit needed to be returned.  Hinson testified that he did not receive an affidavit from Titan on January 4 or any other day, and that he was not even aware that someone from Titan had come to his home on January 4.  He further testified that he would have promptly returned the completed affidavit had he known he needed to do so.

Titan did not make any further attempts to contact Hinson before January 10, the settlement-offer deadline.  Hinson did not return a notarized affidavit by the deadline.  On January 10, Neu delivered the settlement package to Almand's attorneys without the affidavit of additional insurance from Hinson.  In a cover letter to the package, Titan explained that it had unsuccessfully attempted to secure the affidavit from Hinson, stating, "His phone has been disconnected and he has not responded to our many attempts [to contact him]."  According to a January 14 memorandum dictated by Attorney Bradford, he had his staff conduct a records search of Hinson and obtained two phone numbers, one of which he called.  He

was told that Hinson was not available but that he would be home after 5:00 p.m. In other words, Hinson's phone was not disconnected.

On January 16, Bradford sent Titan a letter returning the checks and stating that Almand had rejected Titan's attempt to settle. A short while later, Almand filed suit against Hinson in Florida state court. Ultimately, the case proceeded to a jury trial, resulting in a nearly $2 million judgment against Hinson. In his deposition for this case, Bradford testified that the matter would have settled if not for the failure to timely submit the affidavit from Hinson.

Hinson filed this bad-faith action against Titan in June 2013. Titan timely removed the case to the United States District Court for the Northern District of Florida, and later moved for summary judgment. Upon consideration of Titan's motion for summary judgment and Hinson's response in opposition, the district court determined that there was no genuine issue of material act as to whether Titan acted in bad faith in handling the claim against Hinson. Accordingly, the district court granted summary judgment to Titan. This is Hinson's appeal.

## II.  APPLICABLE LAW

### A.  Standard of Review

We review *de novo* a district court's grant of summary judgment, applying the same legal standards that governed the district court. *Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 608 (11th Cir. 2014). Summary judgment is

appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

At the summary-judgment stage, the court's function is simply to determine if there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). To do so, the court must accept the non-moving party's version of the facts and draw all reasonable inferences in his favor. *Bradley*, 739 F.3d at 608. The court may not weigh the evidence or make credibility determinations. *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. Therefore, summary judgment may be granted "[i]f the evidence is merely colorable or is not significantly probative." *Id.* at 249–50, 106 S. Ct. at 2511 (citations omitted).

### B.  *The Law of Bad Faith in Florida*

Under Florida law, which governs this diversity case, an insurer has a duty to handle claims against its insured in good faith. *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004); *see id.* at 682-83 ("In exchange for [the insured's] relinquishment of control over settlement and the conduct of the litigation, the insurer obligates itself to act in good faith in the investigation, handling, and settling of claims brought against the insured."). An insurer that breaches the duty

to act in good faith, thereby exposing an insured to an excess judgment, may be held liable in a bad-faith action. *See Rosen v. Fla. Ins. Guar. Ass'n*, 802 So. 2d 291, 294 (Fla. 2001) ("[T]he essence of a bad-faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim."). A plaintiff must show "a causal connection between the damages claimed and the insurer's bad faith." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 903–04 (Fla. 2010).

"Good faith" generally means that an insurer must reasonably act in the best interests of its insured. *Berges*, 896 So. 2d at 677. "The standard of care that an insurer must exercise in handling claims against its insured is the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1359 (11th Cir. 2015) (internal quotation marks omitted). Whether an insurer acted in good faith is judged by the "totality of the circumstances." *Berges*, 896 So. 2d at 680. Further, the focus in bad-faith actions is "not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Id.* at 677.

An insurer's duty of good faith, according to the Florida Supreme Court, includes the obligations to "advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an

excess judgment, and *to advise the insured of any steps he might take to avoid [an excess judgment].*"  *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (emphasis added).  The duty also requires the insurer to "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."  *Id.*  In addition, "[b]ecause the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith."  *Id.*

Finally, while summary judgment may be appropriate in certain cases, *Berges*, 896 So. 2d at 680 ("[T]his Court and the district courts have, in certain circumstances, concluded as a matter of law that an insurance company could not be liable for bad faith."), the question of bad faith is, as a general matter, one reserved for the jury due to the flexible and expansive nature of the bad-faith inquiry.  *Id.* at 672–73; *see id.* at 677 ("We conclude that the issue as to whether [the insurer] could have met the deadlines if it had acted with due regard for the interests of its insured was properly submitted to the jury and resolved as a material issue of fact."); *Gutierrez*, 386 So. 2d at 785 ("The question of failure to act in good faith with due regard for the interests of the insured is for the jury.").

## III. DISCUSSION

Hinson contends that sufficient evidence exists that Titan acted in bad faith, precluding summary judgment.  He asserts that Titan failed to act with due regard for his interests when it omitted property damage from its attempts to settle the claim in October and November 2007, despite knowing that Almand's motorcycle was totaled, and also conditioned those early settlement offers on a release of the property-damage claim.  Further, Hinson argues, Titan failed to properly advise him about Almand's settlement offer and the steps he needed to take to avoid an excess judgment.  Specifically, Hinson asserts, Titan failed to take adequate steps to inform him about the need for and significance of the affidavit of other insurance requested as part of the settlement offer.

After reviewing the "totality of the circumstances" in this case in the light most favorable to Hinson, we agree with Hinson that genuine issues of material fact preclude entry of summary judgment in favor of Titan on Hinson's bad-faith claim, particularly as it relates to Titan's conduct upon receiving the time-limited settlement offer from Almand on December 26.  Accordingly, the question of whether Almand's claim against Hinson could have settled had Titan acted with due regard for the interests of its insured should be submitted to the jury and resolved as a material issue of fact.  *See Berges*, 896 So. 2d at 677.

For starters, a possibility for settlement existed in January 2008 following Almand's proposal of the time-limited settlement offer. The settlement offer listed eight material terms that needed to be met by January 10, twenty days from the date of the letter. One of the terms was a notarized affidavit from Hinson listing any other additional insurance coverage. According to Almand's attorney Bradford, the central reason the matter ultimately did not settle was because Titan did not submit the affidavit from Hinson along with the rest of the settlement package. Hinson testified that he would have promptly completed the requested affidavit had he known about it. We therefore focus our inquiry on Titan's efforts, upon receiving the settlement offer from Almand, to advise Hinson of the offer and of the steps he might take to avoid an excess judgment. *See Gutierrez*, 386 So. 2d at 785.

As the district court recognized, substantial evidence supports Titan's contention that it acted in good faith. Titan ultimately complied with all seven settlement terms that were within its direct control. And it is undisputed that Titan attempted to contact Hinson several times about the settlement offer and his need to complete the affidavit. Specifically, Titan called his home three times, sent him a letter, and had someone personally deliver the affidavit to his home. Despite these efforts, and given the short period of time in which to act, Titan was unable to get in touch with Hinson or to obtain the affidavit from him by the deadline.

The district court concluded that, given Titan's undisputed efforts to contact Hinson about the affidavit, any failure to settle was not attributable to Titan's bad faith, but rather was "attributable to Hinson."

Nevertheless, other evidence supports Hinson's contention that Titan failed to act with diligence and care in advising him of the settlement offer and of the steps he needed to take to avoid an excess judgment. *See Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530–31 (Fla. 1974) ("[R]easonable diligence and ordinary care [are] material in determining bad faith."). Well before receiving Almand's settlement offer, Titan knew that Hinson was liable and that he potentially faced a personal judgment far in excess of the policy limits. Almand's settlement offer presented an opportunity for settlement nearly within policy limits, but time was of the essence due to the time limit imposed by the offer. However, Titan waited nearly a week to attempt to contact Hinson about the offer. Granted, some of the delay was attributable to the holidays, as the letter was sent on December 21 and not received until December 26, but Titan's claims notes reflect that Almand's offer letter was first reviewed on December 31, a Monday. Titan did not attempt to contact Hinson until January 2. By that point, more than half the time on the offer had expired.

While Titan made several attempts to contact Hinson between January 2 and January 4, the evidence of these efforts can reasonably be construed as showing a

13

lack of care and diligence in advising Hinson of the settlement opportunity and of any steps he might take to avoid excess liability. *See Gutierrez*, 386 So. 2d at 785. First, Titan called Hinson during times in which it had notice that he would be working and not at home. The same goes for the hand delivery of the affidavit during the afternoon of January 4, when, as Titan knew from the earlier conversation with Kilpatrick, Hinson was likely to be working. Second, the letter Titan sent to Hinson did not identify the deadline by which the affidavit needed to be returned, nor did it clearly explain the significance of the affidavit. Titan acknowledges that it "failed to specifically detail what would happen if Hinson failed to comply with the demand requirement." Third, Neu, the person who hand-delivered the affidavit to Hinson's home, did not know the purpose for which the affidavit was needed or that there was a specific due date by which the affidavit needed to be returned. Finally, Hinson testified that he had no knowledge of Titan's efforts to contact him and that Kilpatrick would have told him had Titan informed her about the settlement offer and the need for the notarized affidavit. This evidence suggests that Titan failed to contact Hinson during a time and in a manner adequate to timely advise him of the offer and of what he needed to do to avoid an excess judgment.

We also find it significant that, following January 4, Titan made no further attempts to contact Hinson until after the January 10 deadline had passed, despite

14

never speaking with Hinson personally or ensuring that he had notice of the offer. Titan's efforts to contact Hinson were limited to the three-day period from January 2 to January 4. Moreover, Titan never inquired of Almand's attorney whether it could get an extension of time based on its difficulties in contacting Hinson.

The district court dismissed this evidence as insufficient to create a genuine issue of fact because it showed "negligence, at best," but negligence is relevant to the question of bad faith. *See Gutierrez*, 386 So. 2d at 785; *Campbell*, 306 So. 2d at 530–31. Specifically, this evidence suggests that Titan did not handle Hinson's case with the same degree of care and diligence Titan would have used to handle its own affairs. *See Mesa*, 799 F.3d at 1359. Overall, we conclude that Hinson has presented sufficient evidence to create a genuine issue of material fact regarding whether Titan handled the claim against Hinson in good faith. *See Gutierrez*, 386 So. 2d at 785.

Titan complains that the short deadline of the offer was a deliberate attempt by Almand's attorney to fabricate a bad-faith claim. That may be a reasonable inference from the events, and one a jury may very well believe, but it is not the only reasonable inference, nor is it directly relevant to the question before us. *See Berges*, 896 So. 2d at 677 (the bad-faith inquiry focuses on the actions of the insurer, not on the actions of the claimant). Almand's attorney testified that the claim would have settled if the requested affidavit had been provided, and a Titan

15

adjuster testified that the claim could and should have settled. In other words, a reasonable jury could find that the settlement offer was legitimate and made in good faith. Because this appeal is from a summary-judgment motion, we draw this inference in Hinson's favor. *See Bradley*, 739 F.3d at 608.

Titan also argues that it provided adequate notice to Hinson under Florida law by sending him a letter regarding the settlement offer, even if Hinson did not receive the letter. Yet the caselaw Titan cites for this proposition, concerning notice of cancellation of a policy under the terms of the policy, has little to no relevance to the law of bad faith, set out above. *See Burgos v. Indep. Fire Ins. Co.*, 371 So. 2d 539, 541 (Fla. Dist. Ct. App. 1979) ("The well established principle of law with regard to the issue of notice of cancellation is that proof of mailing a notice of cancellation to a named insured at the address stated in the policy is sufficient compliance with the policy provision requiring notice to the insured."); *see also Best Meridian Ins. Co. v. Tuaty*, 752 So. 2d 733, 735–36 (Fla. Dist. Ct. App. 2000) (addressing a similar notice provision in an insurance policy).

Finally, Titan faults Hinson for failing to provide adequate contact information or to respond to Titan's requests for information. However, the evidence reflects that Titan had accurate contact information for Hinson, and Hinson testified that he did not know about Titan's efforts to contact him.

16

As for Hinson's contention that Titan acted in bad faith by effectively excluding property damage from earlier settlement offers, the facts do not show a reasonable possibility for settlement at the time of those offers in October and November 2007. As a result, this evidence cannot on its own support a bad-faith claim because it does not establish "a causal connection between the damages claimed and the insurer's bad faith." *See Perera*, 35 So. 3d at 903–04. Nonetheless, the evidence may be relevant to the "totality of the circumstances" regarding Titan's handling of Almand's claim against its insured. *See Berges*, 896 So. 2d at 680. Because we find other genuine issues of material fact that preclude summary judgment, we leave any questions about the relevance of this evidence to be addressed upon remand.

In sum, although substantial evidence shows that Titan handled the claim against Hinson in good faith, other evidence supports Hinson's claim that Titan failed to act with due regard for his interests. As a result, the issue of whether Titan could have fully complied with the terms of the settlement offer by the deadline if it had acted with due regard for Hinson's interests is one that should be resolved by a jury as a question of fact. *See id.* at 677. For these reasons, we vacate the grant of summary judgment in favor of Titan and remand for further proceedings.

17

## IV.  CONCLUSION

For the reasons stated, we **VACATE** the judgment of the district court and

**REMAND** this case for further proceedings consistent with this opinion.[4]

---

[4]    We do not consider Hinson's contention, raised for the first time in his reply brief, that the district court failed to consider or address expert testimony he submitted in opposition to Titan's motion for summary judgment.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682–83 (11th Cir. 2014) (declining to address arguments raised for the first time in a reply brief). We therefore DENY AS MOOT Titan's Motion for Leave to File a Supplemental Brief, or in the Alternative, a Motion to Strike Reply Brief, relating to that issue.