**Mary Ann NEWMANN,
Plaintiff–Appellee,**

**v.**

**UNITED STATES of America,
Defendant–Appellant.**

**No. 90–8625.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 14, 1991.

---

Lawrence B. Lee, Asst. U.S. Atty., Savannah, Ga., for defendant-appellant.

Don C. Kennan, David S. Bills, Atlanta, Ga., and Charles R. Ashman and Jeffrey W. Lasky, Savannah, Ga., for plaintiff-appellee.

Before KRAVITCH and COX, Circuit Judges, and RONEY, Senior Circuit Judge.

COX, Circuit Judge:

## I. OVERVIEW.

This is an appeal of a judgment for the plaintiff in a Federal Tort Claims Act (FTCA) suit. Mary Ann Neumann claimed that she was negligently injured at Winn Army Community Hospital (Winn), where she went to seek treatment for an infection shortly after giving birth. An advisory jury returned a verdict for the United States, but the trial court rejected that verdict and granted judgment for Neumann in the amount of $1,674,495. We affirm.

## II. FACTS.

On October 6, 1987, Neumann went to the emergency room at Winn complaining of severe chills, fever, and lower abdominal pain. She had given birth to a premature child six days earlier. She had uterine tenderness and appeared ill. When she arrived at the emergency room her temperature was measured at 103.4 degrees Fahrenheit; when it was retaken before her transfer out of the emergency room, it was 101.7 degrees. She was examined by Dr. Lawrence, Chief of Obstetrics and Gynecology at Winn. Dr. Lawrence made a tentative diagnosis of postpartum endometritis-a post-birth infection of the uterine lining—and admitted Neumann to the hospital. At admission, she weighed 120 pounds (55 kilograms).

After admitting Neumann, Dr. Lawrence ordered lab tests to assess her kidney function. Based on those tests Dr. Lawrence determined that Neumann's kidneys were functioning properly, and ordered intravenous administration of three antibiotics: gentamicin, 80 milligrams (mg.) every eight hours; penicillin, 5 mg. every six hours; and cleocin, 600 mg. every six hours. Neumann received her first dose of gentamicin at about 10 p.m. that evening, and received an 80 mg. dose every eight hours for the next 3⅔ days, a total of 11 doses.

Gentamicin is ototoxic: it can damage the balance and hearing functions of the ears if it accumulates in the blood serum and tissues of a patient and remains at toxic levels for an extended period. Dr. Lawrence never ordered serum-level monitoring for Neumann, a test that would have told him how much gentamicin had accumulated in her body. A copy of the FDA-approved manufacturer's product information sheet is contained in a standard medical reference called the Physician's Desk Reference (PDR), a compilation of such information sheets. A chart in the product information recommends for a patient of Neumann's weight a dosage of 55 mg. every eight hours for a "serious" infection, and 91 mg. every eight hours for a "life-threatening" infection.

The next day, October 7th, Neumann's temperature dropped below 101 degrees. However, an ultrasound examination revealed a small cystic collection of fluid between her uterus and her bladder, which could have been a hematoma. A hematoma, or pocket of blood, can allow bacteria to multiply, sometimes leading to sepsis, a potentially fatal systemic infection.

On the 8th Neumann's temperature returned to normal. On the 10th Dr. Lawrence discontinued her antibiotics, and on the 11th she was released from the hospital. On the 19th, however, Neumann returned to the hospital complaining of dizziness and lightheadedness. Dr. Lawrence told Neumann to discontinue a medication that he thought might be causing the problem, but Neumann's symptoms did not abate. Over several visits through the end of November the doctors at Winn did not diagnose or cure Neumann's problems.

In early December, Neumann visited a civilian neurologist, Dr. Greenburg. Over the course of the next week or so, Dr. Greenburg ordered and performed a number of physical and neurological tests on Neumann. Based on these tests, he diagnosed Neumann as suffering from a toxic injury to the vestibular system, which is the mechanism in the ear that controls balance. In Dr. Greenburg's opinion, the damage to Neumann's vestibular system is severe.

As a result of her injury, Neumann suffers from severe disorientation. Stationary objects appear to move about within her field of vision, and the problem worsens with even the slightest motion of her head. Reading is very difficult for her, and impossible unless her head is completely motionless. She experiences ringing in her ears, she walks with difficulty, and as a result of her distorted perception has adopted an awkward and sometimes painful gait. She cannot negotiate even a slightly uneven surface, and cannot run.

Neumann's physical difficulties impair virtually every aspect of her daily life. She has a difficult time caring for her child; on at least one occasion she dropped the child. As a result of a birth defect the child needs a special formula, which it takes Neumann up to ten times longer to prepare than it does her husband. She can no longer work as a certified public accountant, and can no longer enjoy the large variety of recreational activities she engaged in, including hiking, camping, fishing, water skiing, and playing softball and other sports. The strain of coping with her perceptual difficulties saps her energy, and by evening she is usually exhausted.

Her physical difficulties have also taken a significant emotional toll on Neumann. A person who excelled in high school, college, and her profession, she is now dependent on others to do even very simple things. She worries greatly about caring for her child, and feels that she is no longer an equal partner in her marriage. She is extremely depressed, and has even thought that her family might be better off without her.

When Neumann sustained the injury to her vestibular system she was employed as a CPA at an annual salary of $34,000, although because of injuries suffered in a car accident, her pregnancy leave, and her husband's transfer and relocation, she had earned only about $9,600 in 1987 through October. She had an excellent work histo-

ry and was highly regarded by her previous employer.[1]

## III. TRIAL COURT'S FINDINGS.

The trial court found that Neumann's injuries were caused by the negligent administration of gentamicin. The court found that Dr. Lawrence and the staff at Winn caused Neumann's injury in the following ways:

> *First,* Government medical staff negligently failed to adjust the dosage according to plaintiff's weight; *Second,* Government medical staff negligently failed to perform serum-level monitoring after administering a dose in excess of the recommended weight-calculated dosage; and *Third,* Government medical staff negligently failed to timely reduce and cease the administration of the gentamicin.

The court found that these failures breached the standard of care and were the proximate cause of Neumann's injury.

The court further found that the damage to Neumann's vestibular system was "total and complete," and that her injury "has adversely affected every aspect of her life." The court found that there would be no significant long-term improvement in Neumann's condition.

The court found that as a result of her injury Neumann can no longer work as a CPA or enjoy any of the many recreational activities in which she previously participated. Based on a number of subsidiary findings, the trial court found that Neumann's lost future earnings, reduced to present value, were $750,000, lost future fringe benefits were $100,000, medical expenses were $6,895, and damages for past and future physical and mental injury were $817,600. The trial court therefore awarded Neumann a total of $1,674,495.

## IV. DISCUSSION.

### A. Standard of care.

█ The government's first and most adamant contention is that the trial court erred as a matter of law in its application of the Georgia law on standard of care. The government relies on a line of cases establishing the proposition in Georgia law[2] that "[t]estimony showing a mere difference in views between [doctors] as to [treatment], or as to medical judgment exercised, is insufficient to support an action for malpractice where it is shown that the procedure preferred by each, or the judgment exercised, is an acceptable and customary method of [treatment]." *Hayes v. Brown,* 108 Ga.App. 360, 366, 133 S.E.2d 102, 106–07 (1963). The government contends that its expert testimony established at *least* that there were two accepted standards of care and that Dr. Lawrence had adhered to one of them. As a matter of Georgia law, therefore, the government contends, the trial court could not find malpractice.

The cases on which the government relies are distinguishable. The reason why can be explained in the language of *Hayes v. Brown* itself. In *Hayes,* "plaintiff's own medical witness declined to designate any of the differences in [treatment] as anything more than matters of medical judgment for the physician in charge in accordance with accepted medical standards." *Hayes,* 108 Ga.App. at 366, 133 S.E.2d at 106. As a result, the *Hayes* court held that the "evidence [did] not create a genuine issue of material fact as to whether Dr. Brown exercised the reasonable degree of care and skill required of him." *Hayes,* 108 Ga.App. at 367, 133 S.E.2d at 107.

Our situation is different. The plaintiff's expert on the standard of care, Dr. Scialli, clearly and repeatedly testified that Dr. Lawrence violated the standard of care in treating Neumann by prescribing a higher dose of gentamicin than normal without ordering serum-level monitoring and by failing to reduce the dose when Neumann's condition began to improve. *See* R.5–234, R.5–243. Thus, we do not have here a

---

**1.** These facts are taken from stipulations, the record, and findings of fact with which the appellant does not argue. No fact is included that either party has disputed.

**2.** State law supplies the rule of decision in Federal Tort Claims Act suits. 28 U.S.C. § 1346(b).

"mere difference of views ... where it is shown that the procedure preferred by each, or the judgment exercised, is an acceptable and customary method." *Hayes,* 108 Ga.App. at 366, 133 S.E.2d at 106–07. Rather, we have expert testimony here that concludes that Dr. Lawrence's treatment was *not* an acceptable and customary method, and in fact was a violation of the standard of care. In other words, the "evidence *does* ... create a genuine issue of material fact as to whether Dr. [Lawrence] exercised the reasonable degree of care and skill required of him." *Id.* at 367, 133 S.E.2d at 107 (emphasis added). Once such an issue of fact has been created, its resolution. is for the trier of fact—here the district court. In choosing to believe the plaintiff's expert, the trial court did not misapply Georgia law.

The government further argues that even should we hold that the trial court did not misapply Georgia law, we should conclude that the trial court's findings that Dr. Lawrence violated the standard of care are clearly erroneous.[3] We first note that we need not address this argument, since it is adequately raised for the first time in the government's reply brief, thus giving Neumann no chance to respond. However, since the argument is not troublesome, we briefly address and dispose of it.

We cannot overturn a district court's findings of fact unless clearly erroneous. Fed.R.Civ.P. 52(a). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation and internal quotation marks omitted). If Dr. Scialli's testimony were the only evidence in the record supporting the court's finding, we might decide, in light of the

substantial expert evidence presented by the government, that the trial court had clearly erred. That question is not before us, however, because other evidence in the record amply supports the trial court's finding.

First and most important, Dr. Lawrence himself testified as an adverse witness called by the plaintiff that he considered Neumann's infection "serious but not life-threatening," and that when he prescribed a dose of 80 mg. for Neumann he knew he was "giving a higher dose than recommended by the manufacturer" in the product information contained in the PDR. R.5–60. The government objects that upon examination by the government he later clarified his testimony to say that he knew the *range* recommended in the PDR and that the dose he prescribed was within that range. "Obviously," the government argues, "his testimony must be considered in its entirety." Reply Brief of the Appellant at 15. We disagree. The trial court was entitled to believe testimony elicited by the plaintiff from an adverse witness and disbelieve testimony elicited by the defense from that witness in just the same way as a factfinder may believe testimony elicited on cross-examination to the exclusion of testimony elicited on direct examination.

Furthermore, the product information in the PDR, described by one of the government's own experts as "kind of the bible for writing [prescriptions for] any kind of medication," R.6–20–21, provides further support for the trial court's finding. The information contains a chart giving recommended dosages by patient weight. The chart recommends for a patient of Neumann's weight, 55 kilograms (kgs.), a dose of 55 mg. every eight hours for a "serious" infection, and 91 mg. every eight hours for a "life-threatening" infection. Plaintiff's exhibit 11. The government argues strenuously that Dr. Neumann's prescription of

---

**3.** The trial court found both that Dr. Lawrence did not timely reduce Neumann's dosage of gentamicin and that he did not timely cease administering it. There is some question, however, about the court's finding that Dr. Lawrence breached the standard of care by failing to timely cease administering the drug. Plaintiff's only

expert witness on the standard of care specifically disavowed such a conclusion. R.5–243. We do not decide whether the finding is clearly erroneous, however, because the remaining portions of the court's findings on the standard of care, if upheld, are sufficient to support the judgment.

80 mg. falls well within this "range," and points out several medical factors that could justify aggressive therapy for Neumann. What the government fails to point out is that directly under the words "Dose for Life–Threatening Infections" are the words "Reduce As Soon As Clinically Indicated." Even though Dr. Lawrence's dose of 80 mg. is closer to the manufacturer's recommended dose for a life-threatening infection than it is to the recommended dose for a serious infection,[4] Dr. Lawrence did not ever reduce the dose, nor did he order serum-level monitoring. Dr. Scialli specifically charged that these failures were violations of the standard of care. Finally, at the very beginning of the gentamicin product information is a boxed section titled "Warnings," which includes both the following statements: "Patients treated with aminoglycosides [including gentamicin] should be under close clinical observation because of the potential toxicity associated with their use"; and "Serum concentrations of aminoglycosides should be monitored when feasible to assure adequate levels and to avoid potentially toxic levels." When all this evidence is taken into account, we must conclude that the trial court's findings that Dr. Lawrence breached the standard of care were not clearly erroneous.

**B. Foreseeability.**

■ The government argues that the injury to Neumann was not foreseeable because its expert testified that no such injury had ever been documented under similar circumstances, and because, according to the government's experts, a formula included in the PDR product information would not have predicted serum accumulation levels sufficient to cause the injury.

The government offered the expert testimony of Dr. Hough, who worked for gentamicin's manufacturer for over twenty years and was closely involved with preparing the product information reprinted in the PDR. As part of his job, Dr. Hough reviewed all incidents of adverse effects from gentamicin that were reported to the FDA from 1964 through 1984. Dr. Hough testified that he had never seen a documented case of ototoxicity in a non-obese person about 30 years old who was receiving no more than 1.5 mg. per kg. of body weight[5] every eight hours for no more than four days. R.6–74.

The government also offered the expert testimony of Dr. Drummond, who has used gentamicin in his practice almost daily since 1974, administering it to "several thousand" patients. R.7–12. Dr. Drummond testified that if the kidneys are working properly, a dose of 80 mg. every eight hours should not accumulate in a patient's blood serum, and that he had never seen such a thing happen. *Id.* at 12–13.

Both experts explained the formula contained in the PDR product information for gentamicin, which uses a multiplier and a predicted half-life—the amount of time it takes the body to eliminate half the gentamicin present at any given time—to guide physicians in predicting the serum accumulation a dose of gentamicin will cause. Both experts testified that a doctor could reasonably rely on the predictions of this formula to prescribe an appropriate dose of gentamicin.

■ Under Georgia law,

in order for a party to be held liable for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient if, in ordinary prudence, he might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result.

*Swofford v. Cooper,* 184 Ga.App. 50, 54, 360 S.E.2d 624, 628 (1987). The question whether an injury is foreseeable is for the factfinder, and can only constitute an issue of law where the evidence is "plain, palpable and indisputable." *Levangie v. Dunn,*

---

**4.** The difference between 55 mg. and 80 mg. (25 mg.) represents almost 70% of the total difference between 55 mg. and 91 mg. (36 mg.).

**5.** Neumann's dosage calculates to 1.45 mg. per kg.

182 Ga.App. 439, 441, 356 S.E.2d 88, 90 (1987).

Under these principles we must uphold the district court's finding of foreseeability. Even without considering Neumann's attempts to weaken the government's evidence—trying to lessen Dr. Hough's credibility by portraying him as a company man, and arguing that the scientific standards he requires for a "documented" injury are far more stringent than the law requires for a foreseeable injury, for example—the district court's finding that Dr. Lawrence breached the standard of care and negligently administered the gentamicin, when combined with the overwhelming evidence in the record that gentamicin is widely known to have ototoxic potential, is more than sufficient to support a finding that Neumann's injury was foreseeable. That such an injury is foreseeable is precisely the reason that the PDR advises that "[s]erum concentrations ... should be monitored when feasible ... to avoid potentially toxic levels." The evidence was not "plain, palpable and indisputable" that Neumann's injury was unforeseeable, so the district court's decision on this issue of fact must stand.

### C. Damages.

The government argues that the trial court erred by failing to reduce Neumann's award of damages by the amount she would have paid in income tax. The government objects that the FTCA's prohibition of punitive damages, 28 U.S.C. § 2674, requires that damages be computed so to provide a future income stream equal to post-tax income. To Neumann's argument that the government has waived this argument by failing to present it to the district court, the government replies that the prohibition of punitive damages is an exception to the FTCA's waiver of sovereign immunity, thus making it a matter of subject matter jurisdiction that cannot be waived.

■■■ This court has held that "to avoid an award of punitive damages, income tax-

es usually must be deducted from future earnings awarded under the FTCA." *Harden v. United States*, 688 F.2d 1025, 1029 (5th Cir. Unit B 1982).[6] Thus, it appears that the district court may have erred in not reducing Neumann's award by the amount she would have paid in income tax. However, we do not agree that the FTCA's prohibition of punitive damages is a matter of subject matter jurisdiction. In *Lawrence v. Dunbar*, 919 F.2d 1525, 1528 n. 4 (11th Cir.1990), we noted that the "*scope* of federal liability [under the FTCA], of concern only after the fact of consent to be sued, and therefore jurisdiction, is established, is set forth at 28 U.S.C. § 2674" (emphasis in original). This distinction between the scope of liability—including the prohibition of punitive damages—found in Section 2674, and the jurisdictional fact of consent to be sued prompts us to conclude that the prohibition against punitive damages is not a matter of subject matter jurisdiction. *But see Flannery for Flannery v. United States*, 718 F.2d 108, 110–11 (4th Cir.1983). As a result, we do not reach the question whether the district court erred in not reducing the award to reflect income tax, because we will not consider an issue not argued to the district court. *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

The government argues that the trial court erred in several other respects in computing Neumann's damages. We find these arguments to be meritless, and uphold the award of damages.

### V. CONCLUSION.

Because we find no error, we affirm the judgment of the district court.

AFFIRMED.

---

**6.** In *Stein v. Reynolds Sec.*, 667 F.2d 33, 34 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit.