[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12868

_____

D.C. Docket No. 1:12-cv-23863-ASG

CARLOS MESA,

Plaintiff - Appellant,

versus

CLARENDON NATIONAL INSURANCE COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 28, 2015)

Before WILSON and MARTIN, Circuit Judges, and VINSON,[*] District Judge.

PER CURIAM:

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

This appeal involves a third-party's claim for bad faith against an insurer in handling a claim against its insured. Plaintiff-Appellant Carlos Mesa appeals the district court's order granting summary judgment in favor of Defendant-Appellee Clarendon National Insurance Company (Clarendon). After consideration of the parties' briefs and the record, and having had the benefit of oral argument, we affirm.

## I. Background

On April 3, 2006, Mesa was one of four injured parties involved in an automobile accident caused by Cesar A. Vega Zelaya. The vehicle driven by Zelaya was owned by Jary A. Martinez, insured by Clarendon, and Zelaya was listed as a permissive driver under Martinez's insurance policy. The bodily injury liability limits under the policy were $10,000.00 per person and $20,000.00 per accident.

Clarendon received notice of the accident on April 24 after receiving a letter from Mesa's attorney, Harvey Friedman. The letter included photographs of Mesa as he lay in a hospital bed, but it did not provide a demand for the policy limits. Friedman advised that Mesa was "totally disabled" and that his condition was self-

2

explanatory.[1]  Clarendon opened a claim file the same day it received notice of the accident.  Clarendon did not contest the issue of liability.

On April 28, Clarendon hired third-party claims administrator RAC Insurance Partners (RAC) to adjust the claims.  RAC immediately began its investigation.  Clarendon hired attorney Lew Jack to identify potential claimants and to assist those claimants in reaching a global settlement.  Jack called Friedman regarding Mesa's claim.  During this initial conversation, according to Mesa, Friedman advised that Mesa would not be willing to take less than the per person bodily injury liability limits in the amount of $10,000.00.

On May 10, Jack sent a letter to counsel for each claimant.[2]  The letter acknowledged that the bodily injury liability limits were insufficient to satisfy all of the claimants' damages and advised that Clarendon was willing to tender the full $20,000.00 per accident bodily injury liability limits in an attempt to globally settle as many claims as possible pursuant to Florida law.  Jack requested a response from each claimant's attorney so that Clarendon could arrange a global meeting between the parties to discuss settlement issues.

---

[1]Unfortunately, Mesa lost an eye as a result of the accident; his injuries were considered to have been catastrophic.  The accident involved four vehicles and ten people.

[2] By May 10, Clarendon, through its investigation, narrowed the potential claimant pool to four injured parties: Mesa, Marie Davis, and Vladimir and Vyacheslaw Morgenstein, husband and wife.  Mesa and Davis were represented by independent legal counsel, while the Morgensteins had joint representation.  By this date, Jack had also been advised that all four claimants intended to make a claim.

On May 19, claimant Davis's attorney responded to Jack's letter of May 10, claiming that Davis's medical bills were approaching $200,000.00. Friedman believes that his office also responded to Jack's letter of May 10 with details concerning Mesa's claim, but acknowledges that no written demand was made at that time.

On June 9, Jack sent another letter to claimants' counsel suggesting that they attempt to reach an agreement to globally settle. Jack instructed the parties to let him know if a global settlement conference would be helpful. He also informed them that he would arrange the settlement conference if the parties believed it would be helpful.

On June 13, and in response to Jack's letter of June 9, claimant Davis's counsel agreed to settle the claims globally and proposed equal division of the $20,000.00 per accident liability limits. On July 19, counsel for the Morgensteins spoke with Jack via telephone to inform him that they too agreed to settle the claims globally on the terms proposed by claimant Davis's counsel. Friedman never responded to Jack's letter of June 9, but he filed a lawsuit against Zelaya and Martinez on June 22. Friedman did not immediately serve the complaint, nor did

he inform any of the other parties that a lawsuit had been filed.[3]  None of the claimants ever voiced an objection to settling the claims globally.

While it is unclear from the record exactly when the call was placed, sometime between June 22 and July 19, Jack called Friedman to determine whether Friedman would agree to the terms of Davis's counsel's proposed settlement. Friedman informed Jack that his partner, Ronald Rodman, was now handling the matter.  During this conversation, Friedman never mentioned that a lawsuit had been filed, nor did he indicate any opposition to the proposed settlement.  Jack then called Rodman and left a voice message requesting that Rodman return his phone call.  Rodman never returned the call.

Zelaya would eventually receive service of the lawsuit over a month after its original filing, on July 24, and Clarendon received its service on August 4. Martinez was never served.  Clarendon subsequently hired defense counsel for Zelaya.  After Clarendon received service of Mesa's lawsuit on August 4, in a letter to Friedman dated August 14, Jack advised Friedman that he was shocked to learn that a lawsuit had been filed because Friedman did not mention it during their most recent telephone conversation.  Jack also expressed frustration over the

---

[3]Friedman alleged that he sent a letter to Jack in response to his June 9 correspondence, on the same day suit was filed, explaining the extent of Mesa's injuries and the amount of the associated medical bills.  A copy of this letter was filed as exhibit six to Friedman's deposition, but the letter was neither signed nor written on the firm's letter-head.  The parties do not dispute the fact that Jack never received the letter, nor is there any record evidence to support Mesa's assertion that it was actually sent.

lawsuit since both Friedman and Rodman seemingly had been reluctant to return his telephone calls or respond to his correspondence letters.

On August 17, Rodman and Jack finally spoke via telephone concerning Mesa's claim and pending lawsuit, and on August 22, Jack sent a letter to Rodman referencing the content of that conversation. Jack advised that during that telephone conversation, he learned for the first time that Mesa was unwilling to accept less than $10,000.00, the per person bodily injury liability limits under Martinez's policy. Jack also advised that he subsequently requested that Clarendon send Rodman a check in the amount of $10,000.00 in exchange for full and final settlement against Clarendon's insureds. Mesa denied this offer.[4]

Clarendon sent Zelaya a letter on August 22 to notify him that a lawsuit had been filed against him and that Clarendon was attempting to settle it. Clarendon did not mention, however, that Zelaya could be exposed to an excess judgment. This letter was the first correspondence between Clarendon and Zelaya since the accident occurred. On October 9, Jack met with Zelaya in person to advise him of the status of the claims and to inform him of his potential liability exposure. On June 5, 2012, an excess judgment in the amount of $750,000.00 was entered against Zelaya.

---

[4] Jack tendered the $10,000.00 settlement check on Clarendon's behalf via hand delivery and offered to further compensate Mesa for all incidental expenses. Still, Mesa refused to settle.

6

On September 28, 2012, Mesa filed the instant action against Clarendon in Florida state court, alleging that Clarendon acted in bad faith in handling the claims against its insured.  Clarendon subsequently removed the case to federal court on the basis of diversity jurisdiction.  *See* 28 U.S.C. § 1332(a).  Both parties then moved for summary judgment.  The district court, after oral argument, and after reviewing the record and the pleadings before it, concluded that no reasonable juror could infer that Clarendon acted in bad faith as a matter of law.  Accordingly, the district court granted Clarendon's motion for summary judgment and subsequently entered judgment in favor of Clarendon.  This appeal ensued.

## II. Discussion

On appeal, Mesa contends that the district court failed to view the evidence in the light most favorable to Mesa, the non-moving party, in considering Clarendon's motion.  Mesa contends that there was sufficient evidence in the record to support a jury's conclusion that Clarendon acted in bad faith in handling the claims against its insured.  Specifically Mesa argues that there was sufficient evidence for the following findings: (1) Clarendon failed to settle Mesa's claim despite having a reasonable opportunity to do so; (2) Clarendon breached its duty to diligently investigate the facts supporting the claims against its insured; and (3) Clarendon's failure to advise its insured of settlement opportunities and courses of action its insured could have pursued to avoid the excess judgment.  Finally, Mesa

7

contends that the question of whether an insurance company acted in bad faith is a question to be resolved by the jury based on the totality of the circumstances.

## A.

"We review the district court's grant of summary judgment de novo, applying the same legal standards as the district court." *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007). We thus view the evidence in the light most favorable to the non-moving party and will affirm only if the movant shows that no genuine issues of material fact exist. *See Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1161–62 (11th Cir. 2006).

## B.

In diversity cases, we are required to apply the substantive law of the forum state; here, Florida. *See Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam).[5] Under Florida law, it is well established that "an insurer owes a duty of good faith to its insured." *See Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004). Florida law provides a cause of action for bad faith against an insurer both statutorily and at common law. *See* Fla. Stat. § 624.155; *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (per curiam). Bad faith actions may be brought by a claimant directly against a tortfeasor's insurer

---

[5] If the highest state court in the forum state has not yet decided an issue of substantive state law "federal courts are bound by decisions of [the] state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule otherwise." *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 158, 68 S. Ct. 488, 491 (1948).

when third-party insurance claims are involved. *See Thompson v. Commercial Union Ins. Co.*, 250 So. 2d 259, 264 (Fla. 1971) (holding that "a judgment creditor may maintain suit directly against tortfeasor's liability insurer for recovery of the judgment in excess of the policy limits, based upon the alleged . . . bad faith of the insurer in the conduct or handling of the suit").

The Florida Supreme Court has set forth an insurer's duty of good faith, which "obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid [the] same." *Gutierrez*, 386 So. 2d at 785. The duty also requires the insurer to "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id*.

The standard of care that an insurer must exercise in handling claims against its insured is "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id*. The insurer must therefore make "decisions in good faith and with due regard for the interests of [its] insured." *Id*. When multiple claims arise from a single accident, the insurer may enter into reasonable settlements with chosen claimants, even if those settlements fully exhaust the policy limits, leaving one or more claimants

9

without recourse against the insurer, so long as the insurer's decision to do so is reasonable and within the purview of its duty of good faith. *See Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So. 2d 555, 560 (Fla. Dist. Ct. App. 2003) (per curiam).

Under Florida law, "the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the totality of the circumstances standard." *Berges*, 896 So. 2d at 680 (internal quotation marks omitted). The question of whether this standard has been met is ordinarily for the jury to decide. *See id.*; *see also Farinas*, 850 So. 2d at 559. Whether the insurer acted with "reasonable diligence" and "ordinary care" are ordinarily factual considerations to be decided by a jury; these considerations are material in determining whether an insurer acted in bad faith. *Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530–31 (Fla. 1974). Finally, a valid bad faith claim requires "a causal connection between the damages claimed and the insurer's bad faith." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 903–04 (Fla. 2010).

## C.

Mesa fails to provide sufficient evidence for a reasonable jury to find that Clarendon acted in bad faith. Upon notification of the accident, Clarendon immediately opened a claim file. Within four days, Clarendon hired RAC to conduct an investigation and adjust any potential claims. Clarendon then retained

Jack shortly thereafter for the purpose of assisting the claimants in reaching a global settlement. *See Gutierrez,* 386 So. 2d at 785 (explaining that the duty of good faith requires an investigation of the facts and fair consideration of a settlement that is not unreasonable under the circumstances). Within seventeen days of being notified of the accident, Clarendon's investigation revealed four claimants. Having acknowledged that there were insufficient funds under the per-person liability limit to satisfy the claimants' damages in full, Clarendon offered the full $20,000.00 per accident liability limit amount in furtherance of a global settlement. *See Farinas,* 850 So. 2d at 561 (noting that an insurer's duty of good faith requires that it attempt to resolve as many claims as possible when there exist multiple bodily injury claimants and insufficient coverage under the policy). Furthermore, we see no evidence in the record, and Mesa does not contend, that he or Friedman ever communicated to Jack or Clarendon an unwillingness to participate in a global settlement. Indeed, without knowing that information, Clarendon had good reason to believe that all four claimants were working towards a global settlement agreement—especially since the other three claimants had already conferred and had expressed to Clarendon their willingness to settle globally.

Although Mesa contends that Clarendon's failure to immediately tender the $10,000.00 per person liability limits to Mesa is evidence of bad faith, because

11

there were multiple claimants, Clarendon's decision to pursue a global settlement was consistent with its duty of good faith under Florida law. *See id.* at 560; *see also Shuster v. S. Broward Hosp. Dist. Physicians' Prof'l Liab. Ins. Trust*, 591 So. 2d 174, 177 (Fla. 1992) (noting that when multiple claimants exist, an insurer has a duty to abstain from "indiscriminately settl[ing] with one or more of the parties for the full policy limits"). And it is not unusual for settlement negotiations to last several months. *See e.g.*, *Gen. Sec. Nat'l Ins. Co. v. Marsh*, 303 F. Supp. 2d 1321, 1326 (M.D. Fla. 2004) (allowing the claimants several months to negotiate a global settlement did not amount to bad faith).

Finally, although Clarendon may have been negligent in failing to keep its insured advised of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment, such negligence was not the cause of the excess judgment, and is therefore immaterial. *See Perera*, 35 So. 3d at 903–04 (noting that "a causal connection between the damages claimed and the insurer's bad faith" is required to support a claim of bad faith); *see also Campbell*, 306 So. 2d at 530–31 (explaining that while negligence is relevant in determining bad faith, the "standard for determining liability in an excess judgment case is bad faith rather than negligence"). While such a claim is indubitably supported by the facts in the record, it demonstrates at best a need for Clarendon to augment its claims practices, not that Clarendon's actions rose to the level of bad faith.

### III. Conclusion

Viewing the facts in the light most favorable to Mesa, we are unpersuaded that Clarendon's handling of claims against its insured rose to the level of bad faith. Clarendon's duty of good faith requires that it investigate the facts and give fair consideration to the prospect of a settlement offer that is reasonable under the circumstances, which it did here. *See Gutierrez*, 386 So. 2d at 785; *Farinas*, 850 So. 2d at 560. Because Clarendon was diligent in its efforts to settle the claims against its insured and there exists no causal connection between the actions of Clarendon and the entry of the excess judgment against its insured, we conclude, as did the district court, that no reasonable juror could conclude that Clarendon acted in bad faith. Accordingly, we affirm the judgment of the district court.

**AFFIRMED**.