[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12950
Non-Argument Calendar
_____

D.C. Docket No. 5:18-cv-00157-JSM-PRL


YOLANDA ALDANA,
LEYVIER HERRERA,
her husband,
YOLANDA ALDANA,
as mother and natural guardian of K.M., a minor,
as mother and natural guardian of A.M., a minor,
as mother and natural guardian of A.A., a minor,
and as mother and natural guardian of K.H, a minor,

                                                            Plaintiffs - Appellants,

versus

PROGRESSIVE AMERICAN INSURANCE COMPANY,

                                                            Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 1, 2020)

Before JORDAN, ROSENBAUM, NEWSOM, Circuit Judges.

PER CURIAM:

Yolanda Aldana and her four minor children suffered severe and permanent injuries in a violent December 2013 car collision caused by a driver insured by Progressive American Insurance Company ("Progressive"). A jury later determined that the driver owed Aldana, her children, and her husband, Leyvier Herrera, nearly $52 million in damages arising from the collision. Aldana, on behalf of herself and her children, and Herrera (collectively, the "Aldanas") then sued Progressive for bad faith in handling their claims against the driver. After the case was removed to federal court, the district court granted summary judgment to Progressive, and the Aldanas appealed. Because genuine issues of material fact remain in the record, we vacate and remand for further proceedings.

## I.

### A.

On December 6, 2013, Aldana stopped at a red light with her four minor children in the car.[1] Moments later, her car was violently rear-ended by a BMW driven by Nathan Pyles. The impact slammed Aldana's car into the vehicle in front of her, which was driven by Jaron Ang. Aldana and her children were rushed to the

---

[1] We present the relevant facts in the light most favorable to the Aldanas, the nonmovants. *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1342 (11th Cir. 2020).

hospital.  Pyles and his passenger, his stepdaughter Aubrey Heffler, were also taken to the hospital.  Ang later went to the hospital on his own.

Pyles was insured by Progressive, with bodily injury liability policy limits of $250,000 per person and $500,000 per occurrence.  After learning of the collision on December 9, Progressive immediately began to investigate the incident and the extent of injuries suffered.  Meanwhile, nearly everyone involved hired attorneys: the Aldanas retained J. Ross Davis; Ang retained Brian Laird; Progressive retained the law firm of Cole, Scott & Kissane, P.A. ("Cole Scott"), to represent Pyles; and the Pyleses (Nathan and his wife Alisha) retained a personal attorney, Robert Batsel.

Within two weeks of the accident, Progressive determined that Pyles was completely liable for the car crash and that Aldana and her minor children had suffered severe injuries.  By this time, Progressive was aware that Aldana was in the ICU until December 8 and suffered broken ribs and a lacerated liver; K.M. (age 12) suffered two fractured femurs, jaw and neck fractures, and two missing teeth; A.M. (age 10) suffered a hip fracture and had intestinal surgery; A.A. (age 8) suffered a fractured femur; and K.H. (age 2) suffered a fractured femur and brain swelling and was possibly paralyzed.  Progressive recognized that these injuries may exceed the $500,000 per occurrence policy limits.  Progressive also learned that Ang's injuries were "soft tissue" and "neck/leg pain" and may be covered by worker's compensation, and that Heffler likely had not been injured.

3

Because there were multiple claimants whose damages likely exceeded Pyles's insurance coverage, Progressive pursued a "global settlement" strategy to attempt to resolve all claims together within the policy limits. On December 18, Progressive sent the Aldanas, Ang, and Heffler an offer to tender the $500,000 policy limits in exchange for a release of all claims against Pyles, if the claimants could figure out among themselves how to apportion it by January 6, 2014. If they could not, Progressive proposed holding a global settlement conference with a mediator. Soon after, Progressive learned that Heffler would not be making a claim, leaving Ang, Aldana, and her four minor children as claimants.

Davis responded to Progressive's offer in a letter on December 30, 2013, stating that the Aldanas' damages "exceed[ed] multiple millions of dollars" and were "way beyond your meager policy limits of $500,000." He explained that K.H., the two-year-old, likely had brain damage and would never walk again. With regard to Progressive's request to "try to apportion the $500,000 between the seven injured individuals," Davis wrote that this request was "virtually impossible to do by the deadline" of January 6 because each of the children needed a guardian ad litem to overlook the apportionment and distribution of any settlement monies. He further stated that he "certainly underst[ood] the wish of Progressive . . . to get some type of an agreement of apportionment of this coverage," but that "out of absolute necessity" the Aldanas needed Pyles to complete a financial affidavit, which was

4

attached, to determine his ability to compensate for their injuries in excess of the policy limits. Around a week later, Davis requested a similar financial affidavit from Alisha Pyles.

Cole Scott unilaterally scheduled a global settlement conference for January 7, 2014, but it was postponed at Davis's request. Davis stated that he was still investigating the case and the sources of any recovery in excess of the policy limits, and that the Aldanas would "not be in a position to make any commitments until our investigation is complete." In the meantime, Progressive received a letter from Ang's worker's compensation carrier's recovery agent stating that it intended to demand repayment of all monies expended on Ang, though it did not identify what those expenditures were.

On January 14, 2014, Cole Scott advised Progressive that the Aldanas were not in a position to attend a global settlement conference and that Ang's attorney was "fine delaying it." Cole Scott suggested three options for how to proceed: (1) "[e]valuate the claims and make offers without a global settlement conference"; (2) "[r]eschedule the conference to take place in 30–60 days"; or (3) "[t]ake no action at this time, and revisit the issue in 20–30 days." It appears that Progressive then spoke with Davis by phone on or around January 16, 2014, and they agreed to follow up in 30 days.

5

The next several months saw little progress. Once a month—on February 13, March 12, April 21, May 15, and June 18—Progressive sent nearly identical letters to Davis (the Aldanas' counsel) and Laird (Ang's counsel). These letters did the following: (a) summarized Progressive's understanding of the parties' positions—that both attorneys were still investigating the extent of their clients' injuries and that the Aldanas were not in a position to discuss settlement; (b) asked if the claimants were "now in a position to discuss settlement and or attend a global settlement conference"; (c) advised that Heffler was not making a claim; (d) reiterated the global offer of the $500,000 policy limits; and (e) requested medical or billing records.

The record shows that Davis responded once to these letters. In March 2014, Davis sent a letter informing Progressive that he was continuing to gather information and noting that he had not yet received a response to his request for financial affidavits from the Pyleses. Davis advised that the medical bills were mounting towards $1 million, that some of the children were "still under very active medical care," and that "$500,000 [was] nothing more than a drop in the bucket." Davis did not include any medical records with his response.

In the meantime, Progressive attempted in vain to get a response from the Pyleses about the financial affidavits. When asked, Batsel (the Pyleses' counsel) failed to provide a clear answer, stating that he did not think the Pyleses would

complete the affidavits (February 14); the Pyleses were trying to get some "issues" resolved before they made a decision (February 26); he was "still awaiting information from [his] clients' accountant" (April 1); and "Sorry, not yet" (April 8). On April 21, Progressive sent an email to Batsel requesting a response "this week" regarding the affidavits, but the record contains no response to this request. It appears that the Pyleses never completed the affidavits. Aside from contacting the Pyleses regarding the financial affidavits, however, Progressive did not discuss with them their potential exposure in excess of the policy limits or any other matters regarding the handling of the Aldanas' and Ang's claims.

On July 3, Laird wrote to Progressive that Ang had injured his back in the collision and was still in pain, and he included a couple of billing statements. Laird also stated his belief that the global settlement conference was "an act in futility" because, due to the severity of the injuries to Aldana and her children, there was "absolutely no chance that they will settle for the policy limit AND absolve Mr. Pyle[s] from further liability." Laird suggested that Progressive try to settle Ang's claim individually and then "concentrate on the other parties."

Progressive responded to Laird two weeks later, maintaining that it would like to go forward with a global settlement conference and would not be making an offer to Ang before then. Around the same time, Progressive sent another letter to Davis that was nearly identical to its earlier letters. One week later, on July 21, Progressive

again asked Batsel whether the Pyleses were in a position to execute the financial affidavits.

In or around August 2014, approximately eight months after the incident, the Aldanas changed counsel and retained John H. Piccin.  Progressive was not notified of the change by Piccin or the Aldanas.  As a result, Progressive sent another letter—nearly identical to its earlier ones—to Davis on August 14.  That same day, Piccin filed suit against Pyles on behalf of the Aldanas in Florida state court.[2]  Progressive learned of the lawsuit from Batsel on September 24, after it had sent another nearly identical letter to Davis on September 11.

After a trial, a Florida jury returned a nearly $52 million verdict in favor of the Aldanas.  A state court entered a final judgment against Pyles totaling just over $50 million.

**B.**

After the adverse judgment, Pyles assigned to the Aldanas any and all rights he had against Progressive arising out of the handling of the Aldanas' claims.  The Aldanas then sued Progressive in Florida state court for bad faith failure to settle, seeking to collect the excess judgment as damages.  Progressive removed the case to federal district court based on diversity jurisdiction and then moved for summary

---

[2] Alisha Pyles was also named as a defendant in the complaint, but she appears to have been dismissed at some point before the jury verdict.

judgment, contending that there was no reasonable opportunity to settle the Aldanas' claims, among other arguments.

The Aldanas responded in opposition, contending that Progressive failed to act with due regard for its insured's interests. Plaintiffs asserted that Progressive should have offered the full policy limits solely to the Aldanas to settle their claims, and that, had it done so, there was a reasonable opportunity to settle and thereby protect its insured from an excess judgment. In support of these arguments, the Aldanas offered affidavits from Pyles, his attorney, and Aldana, among other evidence. Pyles and his attorney testified that Progressive failed to inform them of key facts regarding the claims at issue and that, had Progressive done so, they would have told Progressive to exclude Ang and offer the policy limits exclusively to the Aldanas. Aldana testified (and Herrera echoed) that, "[h]ad Progressive offered the full $500,000 policy limits to me and my children prior to us filing our lawsuit against Mr. Pyles, we would have accepted it and settled our claims." The Aldanas' attorney likewise testified that if Progressive had offered the full $500,000 policy limits to the Aldanas, "we wouldn't be here today, but it didn't," suggesting a possibility of settlement had Progressive focused its efforts solely on the Aldanas.

In addition, the Aldanas retained an expert, George Vaka, to offer opinions about Progressive's claims-handling in this case. In a deposition, Vaka testified that Progressive "did not exercise the requisite care, diligence and prudence . . . in its

handling of the claims arising from the collision of December 6th, 2013." In support of that opinion, Vaka noted that before the Aldanas filed suit Progressive failed to independently assess the value of each claim, to advise their insureds of these likely values, and then to make recommendations about how best to minimize their liability going forward. Because the global settlement strategy was not working and Ang's claim was "the least significant," Vaka opined that Progressive should have asked the Pyleses for permission to leave Ang's claim out and offer the full $500,000 policy limits to the Aldanas, or possibly to settle the largest individual claim (K.H.). Vaka described the Aldanas' claims as a "ticking financial time bomb" that required "proactive adjusting." But in Vaka's view, Progressive failed to act with "any haste in attempting to get this matter resolved" or "as if it were [Progressive's] own personal case."

Progressive replied, maintaining that the Aldanas' evidence did not create a triable issue of fact because the Aldanas' attorney never communicated that the global approach was unacceptable or that the Aldanas would have settled for the full policy limits. Progressive also asserted that the court should disregard, for various reason, the affidavits from Aldana, Herrera, Pyles, and Pyles's attorney. Plaintiffs filed a sur-reply.

In July 2019, the district court entered an order granting summary judgment to Progressive. The court concluded that Progressive had no reasonable opportunity

10

to settle within the policy limits before the Aldanas sued Progressive.  In support of that conclusion, the court noted the following:  (a) Davis (the Aldanas' attorney) never responded to Progressive's request to reschedule the global settlement conference or made a different settlement demand; and instead said he was still gathering information; (b) Davis never provide requested medical information about his clients; (c) the Pyleses never completed the financial affidavits which were, according to Davis, an "absolute necessity"; and (d) Davis refused multiple offers of the $10,000 underinsured motorist policy limits from the Aldanas' insurance company on the ground that he was not yet prepared to settle.

The district court further reasoned that Progressive's global settlement strategy was consistent with its duty to limit its insured's potential for excess liability.  The court concluded that Progressive had no duty to tender the policy limits to the Aldanas collectively, even if they would have accepted that offer, because the children may have needed guardians ad litem appointed to approve any settlement and because Progressive lacked necessary information about the individual claims. Finally, the court stated that Progressive's failure to advise its insured of matters such as Ang's offer to settle did not create a genuine issue of fact because this failure was not causally connected to the excess judgment.  The court did not mention the Aldanas' expert testimony.

The Aldanas filed a motion for reconsideration, which the district court denied. In relevant part, the court found unpersuasive the Aldanas' contention there was a reasonable opportunity to settle, concluding that Aldana and Herrera's "affidavits stating they would have collectively settled for the policy limits is blatantly contradicted by the record, so that no reasonable jury could believe [them]."

## II.

We review *de novo* a district court's grant of summary judgment, construing the facts and drawing all reasonable inferences in favor of the nonmoving party. *Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 608 (11th Cir. 2014). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

### A.

In Florida, an insurer "owe[s] a fiduciary duty to act in [its insured's] best interests." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 677 (Fla. 2004). This duty to act in good faith "arises from the nature of the insurer's role in handling the claim

12

on the insured's behalf," because the insured has surrendered to the insurer control of the handling of the claim and settlement decisions. *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018). When this duty is breached, the insurer may be held liable in a bad-faith action for the entire judgment against the insured in favor of the injured third party, including any amount in excess of the policy limits. *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 58 (Fla. 1995).

In handling claims against its insured, "the insurer has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Harvey*, 259 So. 3d at 6 (quotation marks omitted). The insurer's good-faith duty includes the obligations "to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980). The insurer also must "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.*

These requirements are not "a mere checklist" which, once checked off, will insulate an insurer from liability. *Harvey*, 259 So. 3d at 7. "Rather, the critical inquiry in a bad faith [case] is whether the insurer diligently, and with the same haste

13

and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* This inquiry is based on the totality of the circumstances. *Id.* And "it is for the jury to decide whether the insurer failed to act in good faith with due regard for the interests of the insured," provided there is "competent, substantial evidence" to support a finding of bad faith. *Id.*; *see Berges*, 896 So. 2d at 680–81.

Aside from these general rules, Florida law provides additional guidance for two important aspects of this case: (a) catastrophic injuries; and (b) multiple claimants.

First, according to the Florida Supreme Court, "[i]n a case where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Harvey*, 259 So. 3d at 7 (cleaned up). The Court elaborated:

> In such a case, where the financial exposure to the insured is a ticking financial time bomb and suit can be filed at any time, any delay in making an offer under the circumstances of this case even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith.

*Id.* (cleaned up). While any "damages claimed by an insured in a bad faith case must be caused by the insurer's bad faith," the focus of the inquiry must be on whether the insurer "fulfill[ed] its obligations to the insured" and "not on the actions of the claimant" or his or her attorney. *Id.* (quotation marks omitted).

Second, when multiple claims arise from a single incident, the insurer's "good faith duty to the insured requires it to fully investigate all claims . . . , keep the insured informed of the claim resolution process, and minimize the magnitude of possible excess judgments against the insured by reasoned claim settlement." *Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So. 2d 555, 561 (Fla. Dist. Ct. App. 2003). The insurer retains "a certain degree of discretion in deciding how to approach decisions of settlement and defense." *Id.* Based on that discretion, the insurer may "enter[] into *reasonable* settlements with some claimants to the exclusion of others." *Id.* (emphasis added); *see Shuster v. S. Broward Hosp. Dist. Physicians' Prof'l Liab. Ins. Tr.*, 591 So. 2d 174, 177 (Fla. 1992) (noting that when multiple claimants exist, an insurer has a duty to abstain from "indiscriminately settl[ing] with one or more of the parties for the full policy limits"). Or it may try to pursue a "global settlement" of all claims against the insured. *Mesa v. Clarendon National Ins. Co.*, 799 F.3d 1353, 1360 (11th Cir. 2015) ("[B]ecause there were multiple claimants, [the insurer's] decision to pursue a global settlement was consistent with its duty of good faith under Florida law."). Whatever route the insurer pursues, it must "undertake[] a reasonable claims settlement strategy" that is "in keeping with its good faith duty." *Farinas*, 850 So. 2d at 561.

**B.**

15

With these principles in mind, we turn to the facts of this case.  The Aldanas argue that the district court erred in concluding that Progressive had no reasonable opportunity to settle their claims.  They maintain that the evidence, when construed in their favor, shows that Progressive had sufficient information to know that their injuries far exceeded those of the sole other claimant, and that Progressive could have settled their claims collectively, thereby avoiding the excess judgment, had it offered them the full $500,000 policy limits, as it should have done had it acted in its insured's best interests.[3]

We conclude that there is sufficient, competent evidence, construed in the light most favorable to the Aldanas, to support a verdict in their favor.  Accordingly, we vacate the grant of summary judgment and remand for further proceedings.

No reasonable jury could conclude that Progressive's initial decision to offer the full $500,000 bodily injury policy limits to try to globally settle all claims against Pyles was unreasonable or in bad faith.  Through its investigation, Progressive determined that there were multiple claimants whose damages collectively exceeded the per-occurrence policy limits, and it quickly offered its full policy limits to settle

---

[3] In this bad-faith case, the Aldanas stand in the shoes of Pyles, the insured, to whom Progressive owed the duty of good faith.  Pyles assigned to the Aldanas any and all claims he had against Progressive, and, even if he had not, Florida law appears to permit injured third parties to bring a bad-faith action directly against the first-party insurer as the "real party in interest in a position similar to that of a judgment creditor."  *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 58 (Fla. 1995) (quotation marks omitted).

16

all claims.  By offering the policy limits to globally settle all claims against its insured, Progressive properly attempted "to minimize the magnitude of possible excess judgments against the insured."  *Farinas*, 850 So. 2d at 561.  It was not required to *immediately* tender the policy limits to the most injured parties (the Aldanas).  *See Mesa*, 799 F.3d at 1360 ("Although Mesa contends that [the insurer's] failure to *immediately* tender the $10,000.00 per person liability limits to Mesa is evidence of bad faith, because there were multiple claimants, [the insurer's] decision to pursue a global settlement was consistent with its duty of good faith under Florida law." (emphasis added)).

But there is sufficient, competent evidence in the record for a reasonable jury to conclude that Progressive's actions in the months leading up to the August 2014 lawsuit were not in keeping with its good-faith duty to Pyles.  Progressive suggests that it satisfied its good-faith duty by offering to globally settle and that it was then incumbent on Davis and the Aldanas to respond with a reasonable opportunity to settle.  But Progressive's duties are not a "mere checklist" that, once satisfied, will absolve it of liability; rather, "the critical inquiry . . . is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment."  *Harvey*, 259 So. 3d at 7.  We look to the totality of the circumstances in making that determination.  *Id.*

17

In the circumstances here, the need for haste and diligence was heightened because the Aldanas' claims presented a "ticking financial time bomb and suit [could] be filed at any time." *Id.* Although Progressive did not receive medical records from Davis, a reasonable jury could conclude it knew that that Pyles was clearly at fault, that the Aldanas had suffered severe injuries, and that a judgment well in excess of the policy limits was likely. *See id.* Notably, Progressive offered the policy limits shortly after the collision almost entirely due to injuries suffered by the Aldanas. In addition, Progressive knew in January 2014 that, among other injuries to the Aldanas, K.H. suffered a fractured femur, brain swelling, and possible paralysis, and K.M. suffered two fractured femurs, jaw and neck fractures, and two missing teeth. Consistent with this knowledge, Progressive later heard from Davis that K.H. likely had brain damage, would never walk again, and was "still under very active medical care" as of March 2014, more than three months after the collision. There is also evidence that Progressive believed Ang's injuries to be far less significant than the Aldanas, in addition to being unlikely to result in litigation given his worker's compensation coverage, even if they did not receive medical records from Ang's counsel until July 2014.

Moreover, by the end of April 2014, more than four months after the collision, Progressive's pursuit of a global settlement had gone nowhere. While Davis did not directly reject a global settlement, his last communication to Progressive in March

18

gave no indication that the Aldanas were willing to settle for anything less than the full policy limits, which were "nothing more than a drop in the bucket" compared to their mounting medical bills. It was also unlikely that the Pyleses would complete the financial affidavits, given the lack of response, after months of delay, to Progressive's April 21 email requesting a response "this week."

Yet despite these facts, Progressive, according to the Aldanas' bad-faith expert, failed to act with "any haste in attempting to get this matter resolved" or to proceed "as if it were [Progressive's] own personal case." *See Harvey*, 259 So. 3d at 9 (faulting the insurer in a "ticking financial time bomb" case for failing to do "doing everything possible to facilitate settlement negotiations"). The Aldanas' expert testified that Progressive should have asked Pyles for permission to leave Ang's claim out and instead offer the full $500,000 policy limits to the Aldanas. But instead of doing so, Progressive simply continued to send essentially the same, ineffective monthly letter in May, June, July, and August 2014, and occasionally checked on the financial affidavits, without taking any other action to settle the Aldanas' claims.

Moreover, there is no evidence that Progressive fulfilled its duties to advise Pyles about the possibility of an excess judgment, the possible extent of such a judgment, and "of any steps he might take to avoid same." *See Gutierrez*, 386 So. 2d at 785. Pyles and Batsel, his attorney, both testified that Progressive failed to

19

inform them of key facts regarding the claims at issue and that, had Progressive done so, they would have told Progressive to exclude Ang and offer the policy limits exclusively to the Aldanas.[4]

Based on these and other facts, the Aldanas' expert testified that Progressive "did not exercise the requisite care, diligence and prudence . . . in its handling of the claims arising from the collision of December 6th, 2013." The expert's testimony, which the district court did not address in its analysis, combined with the facts recounted above create a genuine issue of material fact as to whether Progressive "diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment."[5]  *Harvey*, 259 So. 3d at 7; *see id.* at 5, 10 (relying in part on expert testimony to conclude that there was sufficient evidence of bad faith); *cf. Newmann v. United States*, 938 F.2d 1258, 1262 (11th Cir. 1991) ("[W]e have expert testimony here that concludes that Dr. Lawrence's treatment was not an acceptable and customary method, and in fact was

---

[4] Progressive in fact tried this option in December 2015, after the Aldanas filed suit, but by that point it was too late.

[5] In concluding to the contrary, the district court relied heavily on the Aldanas' counsel's failure to respond to Progressive's letters seeking a global settlement and to submit medical records.  But the Florida Supreme Court recently reiterated that "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Harvey*, 259 So. 3d at 11 (quotation marks omitted).  And that Court "has never held or even suggested that an insured's actions can let the insurer off the hook when the evidence clearly establishes that the insurer acted in bad faith in handling the insured's claim." *Id.*

a violation of the standard of care. In other words, the evidence does create a genuine issue of material fact . . . ." (alterations and quotation marks omitted)).

Nevertheless, a showing of bad faith alone is not enough, because Florida law is clear that the "damages claimed by an insured in a bad faith case must be caused by the insurer's bad faith." *Harvey*, 259 So. 3d at 7. The district court concluded that the Aldanas failed to show that there was a reasonable opportunity to settle the claims. In support of that conclusion, the court found Aldana's testimony that she would have accepted the full $500,000 policy limits to settle her and her children's claims to be directly contradicted by her attorney's statements to Progressive regarding the necessity of further investigation, guardians ad litem, and financial affidavits from the Pyleses. Progressive likewise argues on appeal that no reasonable opportunity to settle existed. We disagree.

A reasonable jury could find that the damages claimed by the Aldanas in this bad-faith case were "caused by the insurer's bad faith." *Id.* The Aldanas' expert testified Progressive should have offered the full policy limits to the Aldanas to comply with its good faith-duty to Pyles. And Aldana testified by affidavit that "[h]ad Progressive offered the full $500,000 policy limits to me and my children prior to us filing our lawsuit against Mr. Pyles, we would have accepted it and settled our claims." Davis (the Aldanas' counsel) likewise testified that if Progressive had offered the policy limits to the Aldanas, "we wouldn't be here today, but it didn't,"

21

suggesting a possibility of settlement had Progressive focused its efforts solely on the Aldanas. Thus, there is sufficient, competent evidence that Progressive could have settled the Aldanas' claims and avoided the excess judgment had it acted in good faith to Pyles.

While a jury ultimately may discredit Aldana's and Davis's testimony regarding the likelihood of settlement as inconsistent with Davis's prior statements to Progressive, our role at summary judgment is not to make credibility determinations or weigh the evidence. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."). This testimony is not "directly contradictory" to Davis's prior statements to Progressive, such that no reasonable jury could believe it, for the simple reason that Progressive never offered the policy limits solely to the Aldanas and the Aldanas never responded to that offer.[6] *See Sears v. Roberts*, 922 F.3d 1199, 1208–09 (11th Cir. 2019) (explaining the very narrow circumstances in which a court can disregard a party's testimony as "blatantly contradicted by the record," such as when "a videotape of the incident definitively established what happened and what did not"). And a jury could

[6] Progressive also contends that Aldana and Herrera's affidavits "could have been disregarded pursuant to Fed. R. Civ. P. 37(c)(1)." But the district court did disregard the affidavits under Rule 37, so we decline to consider this argument.

22

reasonably conclude that this possibility never materialized because Progressive failed to act in good faith to Pyles. So while the Aldanas' position on settlement as of March 2014, as reflected in Davis's statements to Progressive, may seem in conflict with their stated position during this litigation, that is a conflict for a jury to resolve, not the court at summary judgment. *See Mize*, 93 F.3d at 742.

For these reasons, we conclude that the evidence, when viewed in the light most favorable to the Aldanas, is sufficient to support a jury verdict in their favor in this bad-faith case. It is therefore "for the jury to decide whether the insurer failed to act in good faith with due regard for the interests of the insured." *Harvey*, 259 So. 3d at 7. We vacate the order granting summary judgment to Progressive and remand this case for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**